KING v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. January 7, 1902.)

No. 1,092.

1. BRIBERY—OFFICER OF UNITED STATES—SUFFICIENCY OF INDICTMENT.

An indictment under Rev. St. § 5501, which makes it an offense for
any officer of the United States, or person acting in any official capacity,
to receive any money, etc., with intent to have his action influenced
thereby, although it does not specifically state the official capacity of
the defendant at the time of receiving the alleged bribe, is sufficient,
after verdict, where it charges that he received such bribe "with intent
to influence his * * * official action" in the payment of money and
the acceptance or rejection of materials for the construction of certain
buildings on a military reservation, which matters were pending before
him or might be brought before him "in his official capacity by virtue
of the authority vested in him * * * by the war department."

2. WITNESSES—CROSS-EXAMINATION IN CRIMINAL CASE—COMMUNICATIONS WITH
PUBLIC OFFICERS.

The rule that communications between the government and its agents
in relation to a criminal case are privileged, on the ground of public
policy, does not deprive a defendant, on trial for a crime against the
United States, of the right, on cross-examination of a witness for the
government, to require him to state agreements or conversations had
with government detectives or other agents, with the purpose and effect
of inducing or influencing his testimony, which are matters proper to
go to the jury, as showing the situation and interest of the witness, and
as affecting his credibility and the weight to be given to his testimony.

3. SAME.

On the trial of an officer of the United States upon the charge of re-
ceiving a bribe from a contractor for public work, the principal witness
for the government was the contractor, who testified fully to the pay-
ment of money to defendant, and the purpose of such payment. He
also testified on cross-examination that he did not voluntarily report the
matter to the government, but was sent for. Held, that it was preju-
dicial error to refuse to permit defendant to ask the witness what pro-
ceedings took place when he was sent for, or whether any promise or
agreement had been made to grant him immunity from prosecution in
consideration of his testimony.

4. CRIMINAL LAW—REVIEW ON APPEAL—HARMLESS ERROR.

Erroneous rulings excluding questions asked the principal witness for
the government in a criminal prosecution, intended to show his interest
or bias and to affect his credibility, cannot be said to have been with-
out prejudice because the defendant afterwards took the stand and
gave testimony which might have authorized or supported a conviction,
where he contradicted the witness as to material matters, since, aside
from the fact that but for such erroneous rulings the defendant might
not have testified, the question of guilt or innocence, under the evidence,
is one for the jury, and not for the court.

5. SAME—EVIDENCE—OTHER OFFENSES.

Where the defendant in a· criminal prosecution has introduced evi-
dence of his good character, it is not error to permit the government to

show on his cross-examination as a witness that he had engaged in another transaction similar to the one charged, and to introduce evidence in rebuttal to show that such transaction was also criminal.

In Error to the District Court of the United States for the Southern District of Alabama.

Cyril W. King, captain and assistant quartermaster U. S. V., the plaintiff in error, was tried in the court below on an indictment charging him with accepting a bribe from one J. H. Hobson, a government contractor, in violation of section 5501 of the Revised Statutes. The verdict of the jury was as follows:

"And now comes the jury, and upon their oaths do say: We, the jury, find the defendant guilty as charged in the second count of the indictment. This 30th day of May, A. D. 1901.          E. O. Fowlkes, Foreman."

The second count of the indictment reads as follows:

"And the grand jurors aforesaid, upon their oaths aforesaid, do further find and present that on, to wit, the 6th day of May in the year of our Lord 1901, within said district, and within the jurisdiction of this court, and before the finding of this indictment, Cyril W. King, whose name, other than as herein stated, is unknown to the grand jury, late of the district aforesaid, did receive from one J. H. Hobson, who was then and there under contract with the quartermaster's department of the United States to furnish material and construct certain buildings on the Fort Morgan military reservation, in the Southern district of Alabama, two thousand dollars ($2,000) in money, in three installments, to wit, five hundred dollars ($500) about the 1st day of November, A. D. 1900, five hundred dollars ($500) about the 15th day of November, A. D. 1900, and one thousand dollars ($1,000) about the 7th day of January, A. D. 1901, with intent then and there to influence the official action of him, the said Cyril W. King, in his official capacity, in accepting and rejecting material used and to be used in the construction of certain buildings on the Fort Morgan military reservation as aforesaid; and he, the said Cyril W. King, did also receive from the said J. H. Hobson the said two thousand dollars ($2,000) in money with intent to influence his, the said Cyril W. King's, official action in the payment of money to said contractor, J. H. Hobson, as aforesaid, at the times and in the manner prescribed in the said contract, which the said J. H. Hobson had with the quartermaster's department of the United States for the construction of said certain buildings on the Fort Morgan military reservation as aforesaid, which said matters and things, to wit, the acceptance and rejection of material used and to be used in the construction of said certain public buildings on said Fort Morgan military reservation by said J. H. Hobson, and the payment therefor, were then and there pending before the said Cyril W. King, or might be brought before him in his official capacity, by virtue of the authority vested in him, the said Cyril W. King, by the war department of the United States,—contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.
                                    "M. D. Wickersham, U. S. Attorney."

After conviction as aforesaid, the said King moved the court in arrest of judgment, and to set aside the verdict of the jury and quash the second count of the indictment, on the ground that the said second count fails to set forth that the said King was an officer of the United States, or was a person acting for or in behalf of the United States in any official capacity, or in behalf of the United States by virtue of the authority of any department or office of the government thereof, and because the said second count does not state facts constituting a crime, misdemeanor, or offense under the constitution, statutes, and laws of the United States. This motion was denied, and the ruling is assigned as error. Afterwards, and before sentence, the said King further moved in arrest of judgment, and for a discharge from any obligation to answer in the said cause, on the ground that the verdict of the jury in the said cause was incomplete and insufficient, in that it fails to find or assess the amount of the bribe received or accepted

by the defendant. The refusal of the court to grant this motion is also assigned as error.

On the trial before the jury, J. H. Hobson, the contractor named in the indictment as giving a bribe to King, was introduced as a witness, and testified substantially as follows: He had a contract with the war department of the government, represented by the defendant, for the construction of certain public buildings at Ft. Morgan. There were plans and specifications connected with the contract. He was executing the contract under the direction and supervision of the defendant from June, 1900, to the early part of January, 1901. The actual construction under the contract did not begin until in July. The defendant inspected and passed on the material and made the payments under the contract from time to time. That prior to November 1, 1900, a great deal of material was c ndemned and rejected. The material was, as a rule, inspected and condemned after it had been put in the buildings, and it had to be taken out. A very little was inspected before being put in the buildings, although it was there on the ground, subject to and available for inspection. A large portion of the material which had been condemned and rejected and taken out of the building was after Oct ber put back in the buildings. Some lumber had been cut in such lengths that it could not be used again. All that could be used was used. This was after November 1st. After that time very little material was condemned, and no more than should have been condemned as being unfit. This was especially the case with some cement which was unfit for the work, and had been brought to it by mistake. Witness further testified that up to October 31st there was $7,000 or $8,000 worth of work done, and that on that day, for the first time, he requested a payment to be made to him; that he and defendant had several hours' talk about the material, and the condemnation and rejection of it, and on the subject of payments. No payment was then made; the defendant assigning various reasons why he did not care to make a payment at that time,—among others, that he was not satisfied his accounts would be audited, inasmuch as the work did not actually begin until after June 30th,—and that he should wait until the work was completed, etc. This conversation was at defendant's headquarters at Ft. Morgan. Witness and defendant came out of the building together, and defendant suggested that witness come to defendant's residence after supper that evening, and perhaps they could reach some agreement in reference to these matters. Witness called at defendant's residence as suggested, and met defendant about 10:30 or 11 o'clock at night. Defendant said he had to go out to the end of the dock to see his engineer, Foster, on a matter of business, and asked witness to go with him. They went out and saw Foster, and, returning, stopped about halfway back and sat down. They were talking as they went along, and sat down and talked. Defendant asked witness if he was paying anybody in Washington for favors or for protection. Witness answered he was not, and said that, as a matter of policy, if he was going to pay anybody any money, it would be the constructing quartermaster on the post, whereupon defendant said that he had expected to make 10 per cent. on the amount of the contract, or about $5,000, out of the operation. Witness replied that the amount named was too large; that he could not afford to pay any such amount. Defendant, in the conversation, said he thought, if the matter was properly arranged, witness could make $6,000 or $8,000 out of the job, and that he knew he had cost witness a good deal of money there, and he would not expect any such sum as $5,000 under any arrangement he could make with him. After talking the matter over, it was finally agreed between them that witness should pay defendant $3,000. Defendant then said he wanted the money paid him in sums of $500 every time he made witness a payment, and that he wished the money brought to his house to him at night; and it was then and there agreed that defendant was to get $500 out of each payment made by him to witness until the total amount of $3,000 was paid him. Defendant then said he would make witness a payment under his contract on the next day, which payment was accordingly made at quite an early hour in the morning, and was by check drawn by defendant on the subtreasury at New York. On the same day witness came

to Mobile and deposited the check to his account with the Leinkauf Banking Company. The check was for about $4,400. Witness drew $500 of the amount, returned to Ft. Morgan, went to defendant's house at night, and handed the money to him. There was no one present except defendant and witness. The next payment was made about the middle of November, by check, which was deposited with the same bank, and a few days thereafter $500 out of this payment was given to defendant in the same manner and place as the former payment. The next two payments to witness were made in December. By agreement, no money out of these payments was paid defendant until in January, 1901, when $1,000 was handed him. This payment was made in Mobile, and it was the last made. This prosecution was then started, and defendant was arrested under it. Witness further testified that after the agreement for the payment of the $3,000 the defendant's action in the acceptance of material was largely more liberal, and a large quantity of material which had been rejected was afterwards accepted and used in the buildings. The United States attorney asked the witness "whether the defendant at any time after the 1st of November gave him any reason or explanation for his method of rejecting material prior to the 1st of November?" Defendant objected to the question as leading. The objection was overruled, and the defendant excepted. Witness answered that he had a conversation with defendant on the subject of his condemnations and rejections of material, and that defendant said, in substance, that he made them in order to bring witness to the point where he would make an agreement with him. Witness stated he could not give or recollect the exact language, but that he gave the substance of it. Witness further testified that the defendant did not agree to perform, and did not in fact perform, any service whatever for him in and about his business and work under his contract with the war department in consideration of the payments agreed to be paid to defendant. On cross-examination the following proceedings were had: Witness was asked by the defendant the following question: "What agreement existed between you and the war department or the department of justice for the United States in regard to exempting you from prosecution so far as this case is concerned?" Objection by the United States. The objection was sustained, and the defendant excepted. Defendant asked this question: "Was there any agreement on the part of the United States to exempt you from prosecution for your part in this affair in consideration of your convicting Captain King, or appearing here as a witness?" Objection by the United States. The objection was sustained, and defendant excepted. Defendant also asked the following questin: "Has any promise or security or immunity from prosecution on your part been made to you by any representative of the United States in consideration of your appearing here as witness against Captain King?" Objection by the United States. The objection was sustained, and defendant excepted. Witness, having answered to a question on cross-examination, that he did not go voluntarily to the government and report the transaction with the defendant, as testified to by him, but that he was sent for, was asked, "What proceedings took place?" to which the United States objected. The objection was sustained, and defendant excepted. The witness having testified that the last payment by him to the defendant was in bills of various denominations, each of which had been marked before being paid to defendant, the defendant asked him the following questions: "This last payment that you speak of with Captain King, it was arranged beforehand between you and certain officers of the government that you could get this money for it and mark it, and that you should go and pay Captain King at a certain time and place, and report the time and place to the government,—in other words, there was an arrangement made to that effect, was it not?" To this question the United States objected. Objection was sustained, and the defendant excepted. The witness having then stated that E. P. McAdams, who is in the secret service of the United States, was present and marked the money, that it was witness' money, and that he took it to defendant, was asked if he paid the money to defendant at the instance of McAdams. He said he paid it at nobody's instance. He was then asked this question, "As between you and McAdams, what was your understand-

ing and agreement there at that time with reference to the payment of money?" To this question, the United States objected. Objection was sustained, and defendant excepted. The rulings of the court in this respect are assigned as error.

After the prosecution rested, plaintiff in error, King, in his own behalf, offered evidence tending to show his good character, and thereafter testified as follows: He denied that he had made any agreement with the contractor, Hobson, as testified by him, by which his action and determination in and about his official duties was to be affected by any financial transactions or other inducement offered or paid by Hobson to the defendant; and his testimony further tended to show that when Hobson came to him on the 31st of October, and the conversation occurred on the wharf, the only agreement which he made was that witness arranged with Mr. Hobson to look after his work, and push forward the services under the contract, and Hobson offered to pay witness what would be a fair rate to look after his (Hobson's) interest, but that under no circumstances would he, in looking after Hobson's interest, depart from the requirements of the specifications, or the performance of his duties as an officer, and that finally it was agreed for such services that he should receive the sum of $3,000, the same to be paid in installments of five hundred dollars at a time, and that Hobson said he would pay to witness the said sum out of the estimate. The witness further testified that he had entered upon the performance of this service, and specified the particulars for the distinct and separate service on Hobson's account; and he further testified that there was less rigidity in the inspection of some of the material, and such easing up was because of the instruction from Maj. Carson, of the quartermaster's department, both verbally given and in writing. On cross-examination the said King further testified: That he was captain and assistant quartermaster during the last year, and down to in January, 1901, and was in charge of the construction of buildings at Ft. Morgan. That he had a conference with Hobson about his work in the latter part of October. That he told Hobson he was negligent or slow in the performance of his contract, and that he considered it was his duty to declare the contract void, and that he did not believe he could pay for the work that would be done under the contract, because of his fear that his accounts would not be audited by the treasury department, on account of his delay in his performance of the contract. That in the afternoon of October 31st Hobson was at defendant's office at Ft. Morgan. They talked over matters generally. There was no estimate made at that time of the amount of work done, and no payment was made or demanded. They separated, and defendant went to supper, agreeing to meet Hobson after supper. They met some time after 9 o'clock and walked down on the dock; returning, they stopped on the way,—all of the time discussing the merits and demerits of the work, at least two hours being consumed in discussing the matter. Defendant told Hobson he regretted he had to tear out a good deal of the work and require other material; that he was aware he (Hobson) had lost a good deal of money there, but that it was unavoidable; that in the discussion Hobson offered to pay him what would be a fair rate to look after his interest there. That Hobson said he believed he (defendant) could help him, and that he (defendant) replied, "There is no question but what I could." Hobson asked how much he (defendant) thought he could save him. Without going into details, defendant said in the neighborhood of $6,000, possibly more. That the outcome of the conversation was that Hobson expressed a willingness to divide what would be saved by defendant. Defendant told Hobson he did not wish to be exacting, and if the minimum, to wit, $3,000, was satisfactory to Hobson, it was to him (defendant), and that the amount of $3,000 was agreed on between them. The manner of payments was then discussed, and defendant suggested that the $3,000 be paid in six payments, of $500 each, and it was agreed that the payments would be made out of every estimate and payment made by defendant to Hobson. That Hobson asked how often such payments could be made, and defendant told him he thought bimonthly payments could be made, and he would see to it that his material was properly selected before it went into the work, and would reduce the amount of condemnations made

after the material had gone into the work. Defendant further testified that there was a difference in his official inspection of material after November 1st from that before that time, as before stated by him. He also testified that, on the next day after the interview and agreement referred to, he made a payment to Hobson of about $4,400, and that, on the night of the next day after this payment, Hobson came to his quarters between 8 and 9 o'clock and handed him $500; that other payments in November and December of $500 each were made to him at his house after dark; also that Hobson paid him $1,000 in January; that a total of $2,000 was paid him; and that he gave no receipts for any of the payments, and did not always count the money. Defendant further testified that he paid Hobson 80 per cent. on the estimates of the work done, and that he had not overpaid him or paid him more than that per cent. at the time he retired from the service and turned over the work to his successor. The defendant further testified on cross-examination: That one Samuel B. Stewart had a contract for putting in plumbing in the buildings at Ft. Morgan during a part of the time Hobson's contract was being executed. It was made with Stewart by defendant under instructions from the quartermaster general. Said plumbing contract was separate and distinct from the Hobson contract. That it was his (defendant's) duty to look after the interests of the government in the execution of the contract, and to inspect and see that the work was rightly done. The amount of the contract was $2,248. And thereupon the following proceedings were had: The defendant was asked by the United States attorney if he demanded any money from said Stewart. Defendant objected to the question on the ground that the answer thereto might incriminate the defendant in a separate and distinct offense. The court suggested that defendant may be cautioned that he need not answer the question if the answer would tend to incriminate him, whereupon the defendant's attorney stated he did not wish to caution the witness, and would not insist on that ground of the objection, but objected to the question as irrelevant and immaterial, and not a proper cross-examination. On inquiry by the court as to the object of the question, the United States attorney stated that he expected to show that defendant had said to Stewart that he could make it hard for him in executing his contract, that subsequently Stewart had trouble in getting his money under the contract from defendant, and that defendant had demanded and received from said Stewart $200 without any legal or proper consideration therefor, and under circumstances tending to show a criminal intent on the part of the defendant. Thereupon the court overruled the objection, and defendant excepted. The defendant stated that he received $200 from Stewart; that Stewart was doing his work in a "botchy way," and defendant told him, if he was not able to do it right, he should employ a foreman who was competent; that he (defendant) and Stewart had some conversation on the subject, which resulted in his agreeing to look after the work and show the plumber how to do it, and Stewart agreeing to pay him $200, which he subsequently did; that he was something over two months performing duties for Stewart, in the latter part of August, and in September and October; Stewart was there during the time. as contractor looking after his work, and he (defendant) was there "in a relative capacity to a foreman and advisory." Defendant further stated that he was not an expert plumber. The rulings of the court in permitting the defendant to be cross-examined with regard to his dealings with Stewart are assigned as error.

In rebuttal the United States called as a witness Samuel B. Stewart, who testified: That he was a plumber. That in 1900 he had a contract for plumbing work at Ft. Morgan, made with the defendant on the part of the government. The amount of the contract was twenty-two hundred and forty-eight dollars. That he (witness) superintended the work, and that he was a practical plumber. The witness was asked by the United States attorney if he at any time during the progress of the work had employed the defendant to do any work for him, as foreman or otherwise? The defendant objected to the examination of the witness, and to the question put to him, "as irrelevant, immaterial, and because it calls for evidence that is not legal and proper in rebuttal." The court overruled the objection, and

the defendant excepted. Witness stated: That he entered into no agreement with defendant to pay him any money for any work to be done for him. That he paid defendant $200 on one occasion in a room at defendant's residence at Ft. Morgan. No one else was present. That the $200 was paid under these circumstances: After the witness had signed the contract for the plumbing, the defendant said to him he could "make it easy for me [witness], or d——— hard," and that thereupon some conversation ensued between them, and that he (witness) understood from what the defendant said that he wanted some money. No amount was named at that time, and no agreement to pay any specific amount. That on a subsequent occasion, when defendant was giving witness a check in defendant's office as a payment under his contract, the defendant wrote on a slip of paper, "Two hundred dollars," and that he would like to have that much if he (witness) could give it to him. The slip of paper was laid before witness on defendant's desk, by which witness was standing. There was no other person present in the room. Witness further stated that he came to Mobile, deposited the check defendant had given him, and drew $250 out of the bank, returned to Ft. Morgan, and carried to defendant $200 of the amount, which was paid to him at his house. To each and every question asked the witness by the United States attorney, and to each and every statement of the witness made in answer thereto, the defendant objected on the grounds stated. The objections were severally and separately overruled, and the defendant excepted.

The court gave the jury a general charge, to which no exception was reserved. The defendant then requested the court to give 41 special charges, reciting in various ways propositions of law as to the burden of proof, the presumption of law in favor of the innocence of the defendant, and giving the well-recognized rules with regard to reasonable doubts, certainty of guilt, etc. Of these the court gave 18, and refused the rest, and to the refusal to give each and every the defendant excepted severally and separately, and assigns errors thereon. There are many other exceptions taken to the rulings of the court in the progress of the trial, and said rulings are assigned as error here, as specifically pointed out among the 57 separate assignments of error found in the record.

T. M. Stevens and Henry Hanaw, for plaintiff in error.

M. D. Wickersham, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). The second count of the indictment under which the plaintiff in error, King, was convicted, does not specifically, in clear-cut terms, charge or describe the official capacity of King at the time he is charged with receiving the bribe in question. It does, however, charge that he received said bribe "with intent to influence his, the said Cyril W. King's, official action in the payment of money * * * for the construction of certain buildings in the Fort Morgan Military Reservation as aforesaid, which said matters and things, to wit, the tender and acceptance and rejection of material used and to be used in the construction of said certain public buildings on said Fort Morgan military reservation by said J. H. Hobson, and the payments therefor, were then and there pending before the said Cyril W. King, or might be brought before him in his official capacity, by virtue of the authority vested in him, the said Cyril W. King, by the war department"; and my Brethren are of opinion that, after verdict, this is a sufficient charge and description of the official capacity of King to bring him within the intent and meaning of section 5501 of the Revised Statutes of the United States, and

therefore the assignment of error based on the denial of the first motion in arrest of judgment is not well taken.

The case shows that J. H. Hobson, the person charged in the indictment as having paid the money to King, was the main witness for the government to establish such payment, and the intent with which it was paid and received; and he testified fully as to the payment of the money, and the object thereof. While perhaps not strictly an accomplice of King, he was unquestionably particeps criminis in the transaction as a whole, and was indictable for his conduct under section 5451 of the Revised Statutes. The case also shows that the question of the guilt or innocence of King depended upon whether Hobson's statement should be taken and believed by the jury as against the voluntary evidence given by King himself. It appears by the record that on cross-examination of Hobson he was asked the following several questions by counsel for King:

"What agreement existed between you and the war department or the department of justice for the United States in regard to exempting you from prosecution so far as this case is concerned?"

"Was there any agreement on the part of the United States to exempt you from prosecution for your part in this affair in consideration of your convicting Captain King, or for appearing here as a witness?"

"Has any promise or security or immunity from prosecution on your part been made to you by any representative of the United States in consideration of your appearing here as a witness against Captain King?"

And having testified that he did not go voluntarily to the government and report this matter, but that he was sent for, he was asked the question:

"What proceedings took place?"

And having testified that the last payment made him by defendant was made in bills of various denominations, which had been marked before being paid to defendant, the defendant then asked the witness the following question:

"This last payment that you speak of with Captain King, it was arranged between you and some officers of the government that you would get this money for it, and mark it, and that you should go and pay it to Captain King at a certain time and place, and report the time and place to the government. In other words, there was an arrangement made to that effect, was there not?"

Also the following:

"As between you and McAdams, what was your understanding and agreement there at the time with reference to the payment of money?"

To each of these questions the attorney for the United States separately objected, and each of said objections was sustained by the court, and the defendant separately excepted to each of said rulings.

In the cross-examination of witnesses in criminal cases a wide latitude is permitted. It is always permissible to show the interest, bias, and prejudice of the witness, and to inquire about any and every relevant and material matter to the issue in controversy which in any way tends to throw light upon the feelings of the witness,

or explains and makes clear his situation with respect to the defendant, in order that the jury may be fully informed of all the facts and circumstances tending to throw light on the weight and importance of the evidence as given. The proposition is elementary, and it is found in the text-books. See 1 Greenl. Ev. (15th Ed.) 684; Whart. Ev. § 408, 544, 561; 1 Archb. N. P. pp. 29, 30, 39. And the rule is well recognized in the decisions of the courts. See Tla-koo-yel-lee v. U. S., 167 U. S. 274, 17 Sup. Ct. 855, 42 L. Ed. 166; Taylor v. U. S., 32 C. C. A. 449, 89 Fed. 954; Tate v. State, 86 Ala. 33, 5 South. 575; Amos v. State, 96 Ala. 120, 11 South. 424; Rivers v. State, 97 Ala. 76, 12 South. 434. In fact, we do not understand that the learned district attorney, who represented the defendants in error in this case, disputes this, but, rather, relies upon the proposition, and his contention is, that in this case, and under the circumstances shown in the record, the answers to the questions sought were not permissible because they were directed towards the ascertainment of a state secret, which is privileged on grounds of public policy. In support of this contention, counsel cites Rosc. Cr. Ev. (Sharswood's Ed.) 185, as follows:

"Where a communication takes place between a counsel or an attorney and his client, or between government or some of its agents, such communication is privileged, on the ground that, should it be suffered to be disclosed, the due administration of justice and government could not proceed; such administration requiring the observance of inviolable secrecy."

And he also cites in support Steph. Dig. Ev., 7 Am. & Eng. Enc. Law, p. 102, and 1 Greenl. Ev. (15th Ed.) § 250.

In this case we do not think there is any necessity to approve or dispute the proposition cited from Roscoe, nor to determine how far the public policy which shuts the mouths of witnesses in regard to state secrets can be safely applied when it conflicts with the constitutional right of every person tried in the courts of the United States to have a fair and impartial trial. However the main proposition may be, we are clear that the conversations of government detectives and other agents with witnesses, with the purpose and effect of inducing and influencing the evidence of such witnesses, do not rise to the dignity of state secrets, and, when a witness so induced or influenced appears on the stand and testifies, he may be cross-examined as to any and all inducements made to him on the part of any one in connection with his evidence; and we think it would be intolerable for government agents to be allowed to give inducements to witnesses, and not have the same freely exposed on the witness stand, so as to inform the court and jury as to the proper weight of the evidence given.

The learned counsel further contends that the rulings refusing and denying the right of cross-examination, as shown by the bill of exceptions, do not constitute reversible error in this case, because, he says, it was error without injury. He claims that an examination of the record will show that the material part of Hobson's testimony is fully corroborated by the defendant in his direct examination, and also in his cross-examination, so that, if the evidence of Hobson be wholly discarded, the evidence of the defendant would

fully justify a jury in rendering a verdict of guilty, and a trial court in awarding sentence. We have given the question very serious attention, and, pretermitting the suggestion that the adverse rulings of the court, refusing to allow the interest and bias of Hobson to be given in evidence, may have compelled or induced the defendant, King, to give evidence in his own case, we are compelled to conclude that, while King's evidence corroborated and agreed with much of the evidence of Hobson, yet, on the material question as to the consideration and purpose for which the money was paid by Hobson to King, the two are diametrically opposed. If Hobson's evidence should be discarded from the record, the only evidence before the jury to determine whether King received the money as a bribe would be King's statement of the circumstances; and from that evidence, while it may be determined that he was guilty of immoral conduct, and perhaps of a criminal offense against the statutes of the United States, he was not guilty of bribery, as charged in the indictment. Besides this, the finding of guilty in a criminal case in the courts of the United States is a matter for the jury, and, barring a plea of guilty entered by the accused, never becomes a finding by the court. We do not dispute that an accused on trial may by admissions show such a state of facts that the previous rejection of evidence in his favor, or other adverse ruling, may become immaterial, and be so treated on error, but this is not such a case. The pivotal question on the trial was as to the intent and consideration of the payment of money by Hobson to King. Hobson testified that the money was agreed to be paid and was paid to influence King, in his official capacity, in accepting or rejecting the work of Hobson as contractor. King testified that it was agreed to be paid and was paid for services outside of his official capacity, in inspecting material before it went into the work, and for assistance in forwarding the work. With the evidence of both in the case, it was a question perhaps easy of solution, but wholly for the jury. With Hobson's evidence out of the case, the solution is not so easy, and only the verdict of a jury would meet the requirements of the law.

The assignments of error based upon rulings of the court permitting the accused, King, as a witness, to be cross-examined in regard to his dealings with Stewart, and afterwards, in rebuttal, permitting Stewart to be cross-examined in reference to a bribe alleged to have been paid by Stewart to the accused, King, in connection with a plumbing contract, are not well taken, because the accused, King, had voluntarily put his good character in evidence, and made it one of the issues in the case. The authorities cited, therefore, in support of these assignments, are not applicable.

The other assignments of error need not be considered, because they are clearly without merit, or are based on rulings which were incidental to that particular trial, and not likely to appear in another.

For the erroneous rulings in regard to the cross-examination of witness Hobson, we are reluctantly compelled to reverse the judgment of the circuit court, and remand the case for a new trial, and it is so ordered.