## Wytheville.

### PEDEN V. PEDEN'S ADMINISTRATOR.

#### June 14, 1917.

#### Absent, Burks, J.*

1. WITNESSES—*Privileged Communications—Statements to Tax Officers.*—A person's own statement of his own taxable property, to the proper official, is not a privileged communication at common law. The State may make such communications privileged by express statute; otherwise, they are not privileged.

2. WITNESSES—*Privileged Communications—Statements to Tax Officers.*—In an action by the administrator of defendant's mother against defendant to recover the possession of certain negotiable notes, it was material to ascertain whether defendant came into the possession and ownership of them before the death of his mother.

   *Held:* That oral statements, not under oath, by defendant to the examiner of records of his circuit and the commissioner of revenue of his city, that the notes in question were not his property on the first of February preceding his mother's death, and did not come into his possession or become his property until after the death of his mother, were not privileged communications at common law, nor were they made so by the act of 1915, p. 158, providing that the answers required under oath under that act should not be disclosed unless called for by a court of record, or by the State advisory board, or a local board of review. Under the present statute, Acts 1916, p. 420, such statements would be privileged.

Error to a judgment of the Corporation Court of the city of Fredericksburg, in an action of detinue. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

*Case submitted before Judge Burks took his seat.

STATEMENT OF THE CASE AND THE FACTS BY SIMS, J.

This is an action to recover the possession of certain negotiable notes by the defendant in error (hereinafter designated "plaintiff") against the plaintiff in error (hereinafter designated "defendant"). The case resulted in a verdict and judgment for the plaintiff in the court below.

The question at issue before the trial court was whether the choses in action sued for were the property of the plaintiff's intestate or of her son, the defendant, and it was material to ascertain whether the latter came into the possession and ownership of them before the death of his mother.

Upon that issue, the court below, over the objection of the defendant, permitted the examiner of records of defendant's circuit and the commissioner of the revenue of defendant's city, to testify as to certain statements made to them by the defendant, to the effect that the notes in question were not his property on the first of February preceding his mother's death and did not come into his possession, or become his property, until after the death of his mother, which occurred the latter part of such February.

The statements referred to were made by the defendant to said tax officials on the subject of the listing of said choses in action for taxation.

The statements aforesaid were not given by the defendant under oath. They were not given before the local board of review; they were not given in a list or in interrogatories in writing of and with respect to bonds, notes and other evidence of debt, signed and sworn to, required by law to be furnished by tax payers to commissioners of the revenue (Acts 1915, p. 98), nor in any answer under oath required by or before the local board of review (Acts 1915, p. 158).

The statements aforesaid made by defendant to the examiner of records were made about the month of September of the year in question, under the following circumstances, as testified to by the examiner:

"* * * I got some information somewhere that there was a suit pending in which it was claimed that Mr. Peden was the owner of $3,000 deed of trust notes, that came from his mother. I understood that the claim was that they had become his property prior to February, 1915. I asked Mr. Peden with reference to that and he stated that the notes were not his on the first of February; that they did not become his property until his mother's death, which was sometime the latter part of February. I was surprised at that and asked him again, and told him I wanted to be certain about it; that if they were his mother's notes, I would report them in my fiduciary report, and if they were his, they would be charged to him; that that would be the only difference, and he repeated his statement that they were not his on the first of February, 1915. * * *"

"Was Mr. Peden answering any interrogatory at that time?"

"No, sir, Mr. Peden did not give in any written interrogatory last year of intangible personal property to the commissioner of revenue. The law requires the commissioner of revenue to turn over all the interrogatories which he receives to me after a certain time. He turned over the interrogatories to me, and among them I found an income report, but no report of intangible property from Mr. Peden."

By Mr. Butzner:

"There was no contest over Mr. Peden's return before the board of review as to intangibles? * * *"

"None at all."

The statements aforesaid made by defendant to the commissioner of revenue were made on October 2nd of the year in question, and as per testimony of the latter were as follows:

"Mr. Peden came into my office on this day, October second, and handed me a list of bonds for entry. I looked at them and told him that this sheet handed me by the examiner of records was completed, and I did not know exactly what to do with the bonds, and would have to get authority, direction, as to where they would be placed, if at all, in this record, from the fact that Mr. Peden, as he told me, came into possession of these bonds after the first day of February, 1915. I looked at them and took no note of them other than the addition of the bonds for the entire amount, which was $3,000. There were two sheets on which these bonds were listed. * * *

"I had no authority to take them at all, after the first day of February, and I told him if they came in his possession after the first day of February I had no authority to tax them, but he said he wished them listed for taxation under his name. * * *

"My impression is that Mr. Peden said that they were in his mother's possession, somewhere in the house, if I mistake not in a trunk, and after her death he took possession of them, and wanted to list them for taxation."

The sheets of paper referred to by the last named witness were not the list required by statute above referred to and were not under oath.

The statute on the subject of the lists or interrogatories above referred to (Acts 1915, p. 98) so far as material, is as follows:

"Section 8. Classification under schedule C shall be as follows:

"First: Bonds, notes and other evidences of debt," etc.

"The commissioner shall require each person * * * residing in his city * * * to make out and deliver to said com-

missioner a list in detail * * * of all bonds, notes and other evidences of debt owing to such person in excess of one hundred dollars * * * This list shall be signed and sworn to by the taxpayer * * *"

At the time the communications in question were made to him, the duty of the examiner of records with respect to the assessment of choses in action for taxation, so far as material, as provided by said statute (Acts 1915, p. 157) were as follows:

"* * * * it shall be the duty of said examiner * * * to assist the said local boards of review in the examination of * * * the returns of taxpayers of all such intangible personal property * * * to examine the returns aforesaid and the records, both State and Federal, with a view to ascertaining and reporting for taxation the values to be extended by said commissioners of the revenue on all intangible personal property * * * liable to taxation under the laws of this State. As soon as such examinations and taxations are made by the examiner of records, he shall make report thereof to said local board of review * * *" It is also provided in this statute that each examiner of records shall receive a commission upon "valuations added as a result of his investigations and examinations of the returns of intangible personal property * * * of taxpayers not returned by them."

At the time of the trial in the court below, "the answers required under oath" consisted of those of the taxpayer in the list or interrogatories required by law as above stated, and such answers as he might give under oath upon being summoned by the local board of review before it when there interrogated. The examiner of records had the statutory power to have the taxpayer brought before the local board of review for examination and there to examine the taxpayer under oath. The statute on this subject (Acts 1915, p. 158) is as follows:

"The local board of review shall have authority to summon taxpayers, or their agents or any other person having information on the subject before them, and require them to answer under oath all questions. * * * Upon the request of the examiner of records the said local board of review, or its chairman, shall summon any such taxpayer before it to answer *on oath* such questions as may be propounded by said board or examiner of records."

At the time that this case was tried in the court below the statutory enactment, embodying the policy of this State on the subject of what statements of taxpayers should be privileged was contained in said Acts of Assembly, 1915, p. 158, and was as follows:

"The answers required under oath of the person, firm, corporation, agents or witnesses, shall not be disclosed unless called for by a court of record, or by said State advisory board, or any local board of review."

Subsequently to the trial of this case in the court below, the said statute embodying the policy of this State on the subject of privileged statements of taxpayers was changed, and enlarged in its scope (Acts 1916, p. 420), and is as follows:

"The information procured by local boards of review and examiners of records under this act shall be regarded as confidential, except for the purposes of assessment, and shall not be disclosed except to the State tax board or to some other local board of review or to officers charged with the assessment and collection of taxes, or to a court of record upon its order."

The latter statute was not in force when the court below admitted the testimony in question.

*F. M. Chichester, G. B. Wallace* and *R. E. Byrd,* for the plaintiff in error.

*C. O'Conor Goolrick* and *W. W. Butzner,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the opinion of the court.

It is admitted in argument that if the statute of 1916 last above quoted had been in force, at the time of the trial of this case in the court below, the testimony admitted over the objection of the defendant would have been privileged and inadmissible without order of court first obtained in a proper proceeding therefor dispensing with its privileged character. Such statute not being then in force, however, the question we have to determine is—

1. Were the communications in question privileged, (a) at common law, or (b) under the statute of 1915 above quoted?

Counsel for defendant contend that such testimony is privileged at common law and under said statute of 1915.

It is clear that the communications in question do not come within the express provisions of the statute of 1915; but it is contended that they come within their spirit and meaning—within the consideration of public policy underlying and sought to be enforced by such statute. As this seems to be a question of first impression in this State, a consideration of the subject on principle and in the light of the authorities, developing to some extent the fundamental distinctions thereby made, would seem to be desirable.

We will consider first the following authorities, most of them cited and relied on by counsel for defendant:

*Hennessy* v. *Wright,* 9 Eng. R. C. 570, was an action of libel by the Governor of a Colony against the defendant, because of a statement made by the latter in a newspaper. On application for discovery by defendant the plaintiff objected to producing certain documents on the ground that he held

them in 'his capacity as Governor and that the Secretary of State for the colonies had directed the Governor not to produce or disclose such documents and to object to their production on the ground of the interest of the State and the public service.

The court in its opinion considered two classes of State documents privileged from discovery—

1. Where the publication of State documents may involve danger to the nation in the direction of involving it in war.

2. Where the publication of such documents may be injurious to servants of the Crown as individuals, which would end all freedom of official communication, etc.

Of the latter class, the privileged communications of client to solicitor, and of an informer to a revenue officer, are mentioned.

As to State documents, what is the public policy, it is said, may turn to some extent on acts of Parliament on the subject.

Discovery was denied on the ground that the case fell within the first class above named.

*Cole* v. *Andrews,* 74 Minn. 93, 76 N. W. 962, was an action for malicious prosecution. *Held:* Defendant's communications to the county attorney, in the official capacity of the latter, for the purpose of having a prosecution of plaintiff for a public offense, were not privileged. That the relationship of attorney and client did not exist between defendant and the county attorney. Neither were the communications privileged under section 5662 of the Gen. St. 1894 of the State, providing that "a public officer cannot be examined as to communications made to him in official confidence when the public interest would suffer by the disclosure."

The court, in its opinion, said: "In the first place, the communications to the county attorney were not made in confidence. Further, the defendant testified fully as to all the facts, first, before the grand jury, and next, on the trial

of the indictment, and the prosecution has terminated. And lastly, the defendant has voluntarily disclosed in his answer in the case, that he did communicate the facts to the county attorney and he set up that fact as a defense. How the public interest would suffer or how it would be any breach of confidence towards the defendant to permit the county attorney to disclose what those communications were, is not apparent to us."

*Thompson* v. *The German Valley R. Co.,* 22 N. J. Eq. 111, was a case of *subpoena duces tecum* to compel a Governor of New Jersey to appear and testify before an examiner of court, and to bring with him an engrossed copy of an act of Assembly. The process was directed to the Governor in **his individual** name and not as Governor. *Held:* He should have attended as a witness, but was entitled to withhold any paper or document in his possession, or any part of it, if in his opinion his official duty required him to do so. These were the rules adopted by Chief Justice Marshall in the trial of Aaron Burr. 1 Burr's Trial 182, 2 *Ibid.* 535-6.

*State* v. *Hoben,* 36 Utah 186, 102 Pac. 1000, was a case of prosecution for rape. The prosecutrix made certain communications to the district attorney. *Held:* Such communications came within the provisions of subdivision 2 of sec. 3114, Comp. Laws 1907, which is as follows:

"2. An attorney cannot without the consent of his client be examined as to any communications made by the client to him * * * in the course of professional employment."

The court did not decide whether it came within subdivision 5 of such section, which was as follows:

"A public officer cannot be examined as to any communication made to him in official confidence, when the public interests would suffer by the disclosure;" but further held that the privilege of the prosecutrix under sub-section 2 was waived by her first testifying to what she stated to the district attorney. The court said, as to sub-section 5 being applicable:

"* * * this subdivision relates especially to matters pertaining to the affairs of the State or nation, or concerning State secrets or communications by informers to public officials. The evidence is excluded because it would prejudice the interests of the public and because public safety is best subserved by keeping out such evidence. Jones Ev. (2nd ed.), sec. 762; Elliott Ev., sec. 639; 4 Wigmore Ev., sec. 2367. It is indeed very doubtful if it was made to appear in what particular the public interest would suffer by the disclosure."

To the same effect, without statute, as above holding as to subsection 2, *State* v. *Brown,* 2 Marvel (Del.) 380, 36 Atl. 463.

*King* v. *United States,* 112 Fed. 988, 50 C. C. A. 647, was a case of trial on indictment of an officer of the United States for receiving a bribe from a contractor. The latter, a witness for the government, was asked on cross-examination several questions as to whether the Department of Justice had promised him immunity from prosecution if he would testify against the accused, etc. The rule laid down by Rosc. Cr. Ev. (Sharswood's Ed.) 185, that "Where a communication takes place between a counsel or an attorney and his client, or between government or some of its agents, such communication is privileged on the ground that, should it be suffered to be disclosed, the due administration of justice and government could not proceed; such administration requiring the observance of inviolable secrecy," was relied on by counsel for the government, and they also cited Steph. Dig. Ev., 7 Am. & Eng. Enc. Law, p. 102, and I Greene Ev. (15th ed.), sec. 250.

The court said that this objection rested on the ground that the questions were not permissible, "because they were directed towards the ascertainment of a State secret, which is privileged on grounds of public policy. * * * In this case we do not think there is any necessity to approve or disapprove of the proposition cited from Roscoe, nor to deter-

mine how far the public policy which shuts the mouths of witnesses in regard to those secrets can be safely applied when it conflicts with the constitutional rights of every person tried in the courts of the United States to have a fair and impartial trial."

The court then held that, "the conversations of government detectives and other agents with witnesses, with the purpose and effect of inducing and influencing the evidence of such witnesses, do not rise to the dignity of State secrets, and when a witness so induced or influenced appears on the stand and testifies, he may be cross-examined as to any and all inducements made to him on the part of any one in connection with his evidence; * * *"

*Kessler* v. *Best* (C. C.), 121 Fed. 439. *Held:* merely that documents which are part of the archives of a foreign consulate are privileged, and a witness cannot be compelled to disclose their contents.

*In re Lamberton* (D. C.), 124 Fed. 446, holds that a collector or a deputy collector of internal revenue cannot be compelled to disclose as a witness, before the court or the grand jury, the names of persons in whose places of business special tax stamps are posted, or the places in which the same are posted; his information on the subject having been obtained in his official capacity and primarily from the records of his office, copies of which he is forbidden to furnish by the lawful regulations of the Treasury Department. In such cases there has been, in effect, an express statutory declaration of public policy.

*In re Huttman* (D. C.), 70 Fed. 699. *Held* (per syllabus) : "Regulations made by the commissioner of internal revenue pursuant to statutory authority, with the approval of the Secretary of the Treasury, in respect to the assessment and collection of internal revenue, have the force of statutes * * *

"A deputy collector cannot be compelled to testify in a criminal proceeding in a State court, as to statements made

to him by an applicant for a special retail liquor dealer's tax stamp, which statements were made for the purpose of being reduced to writing and embodied in the records of the internal revenue office. To divulge such statements would be to divulge the contents of the records themselves, which is forbidden by the internal revenue regulations."

To the same effect: *Stegall* v. *Thurman* (D. C.), 175 Fed. 813; *Boske & Comingore*, 177 U. S. 459, 20 Sup. Ct. 701, 44 L. ed. 846.

*In re Joseph Hargreaves, Limited* (English Court of Appeals, Chy. Div.), 1 Ch. 347: The question was upon the propriety of the refusal of the court below to grant an order under section 115 of the companies act, 1862, to compel the surveyor of taxes to attend before the liquidator of the company for examination as a witness, and to produce balance sheets which had been given him by the company for the purpose of his assessment of income tax against it. The act left the matter of granting such an order discretionary with the court. There was a certificate by the board of inland revenue that in their opinion the production of the documents referred to "would be prejudicial to the public interest and service." The court of appeals declined to interfere with the action of the court below refusing to grant the order in question.

In *Bowman* v. *Montcalm, Judge*, 129 Mich. 608, 89 N. W. 334, it was held that tax lists which property owners are required to furnish the assessor cannot be used for any other purpose than that *limited by statute,* Comp. Laws, sec. 3846, which provides that no such lists "shall be used for any other purpose except the making of an assessment for taxes as herein provided, or for enforcing the provisions of this act." (Italics supplied.)

To same effect: *In re Reid* (U. S. Dist. Court, Mich.), 155 Fed. 933.

In *Worthington* v. *Scribner*, 109 Mass. 487, 12 Am. Rep. 736, the question was whether the defendants in an action

of tort for conspiring to injure and damage plaintiff by preventing his importation of books, by representations to the Treasury Department of the United States that plaintiff intended to import books without payment of the lawful duty thereon, etc., could be compelled to testify they gave such information? *Held*: Defendants cannot be compelled to give testimony on such subjects. Mr. Justice Gray, in delivering the opinion of the court, said: "It is the duty of every citizen to communicate to his government any information which he has of the commission of an offense against its laws. To encourage him in performing his duty without fear of consequences, the law holds such information to be among the secrets of State and leaves the question of how far and under what circumstances the names of the informers and the channel of communication shall be suffered to be known, to the absolute discretion of the government, to be exercised according to the views of what the interests of the public require. Courts of justice, therefore, will not compel or allow the discovery of such information, either by the subordinate officer to whom it is given, by the informer himself, or by any other person, without the permission of the government. The evidence is excluded, not for the protection of the witness or of the party in the particular case, but upon general grounds of public policy, because of the confidential nature of such communications."

The learned judge then proceeds to give a resume of the English authorities on the subject of information given to revenue officers touching matters falling within the discharge of their duties, going to the extent of clothing with secrecy the name of the informer, as well as all information given by him, unless waived by the State. The same is held with respect to information given military courts, boards of custom, the President of the United States by a military officer, Governors of States, unless waived by the representatives of government. Such waiver, in prosecutions by the

government, can be made by the official or other person being introduced as a witness for the government, or by the President or Governor, etc., voluntarily testifying.

Judge Gray then says: "The reasons and authorities already stated conclusively show that the communications in. question are privileged in the latter sense" (*i. e.,* in such sense that courts of justice will not permit or compel their disclosure without the assent of government) "and cannot be disclosed without the permission of the Secretary of the Treasury."

The privileged character of communication between husband and wife and of client to attorney are also referred to by counsel, as illustrations of the public policy underlying the said statute of 1915. The latter communications fall within a different class from the communication with which we are concerned in the instant case. The former are private in their nature and are privileged because they fulfil certain fundamental conditions prescribed at common law. The communications in question, in the case before us, would, in their nature, concern the public, and would be privileged at common law only in the event that they fell within the category of State secrets and official documents. See authorities above cited, and 4 Wigmore on Ev., pp. 3185-3270 and 3320-3346. The able and exhaustive treatment of the subject by the learned author of the last named work renders it unnecessary for us to discuss it further in detail here.

In brief, the summary of the law, as applicable to the case before us is this: "* * * a person's own statement of his own taxable property * * * to the proper official * * * is not a privileged communication at common law." 4 Wigmore on Ev., sec. 2374, subsec. 4, p. 3334. The State may make such communications privileged by "express statute;" otherwise, they are not privileged. *Idem.*

Cogent reasons are urged by the learned writer last cited why the doctrine touching privileged communications should

not be extended where "matters of fact in the possession of officials concerning solely the internal affairs of public business * * * material to be ascertained upon an issue in a court of justice," are in question. *Idem,* sec. 2375, pp. 3334, 3339, 3340-1-2-3.

Certainly, it is beyond the legitimate power of the courts to extend the doctrine under consideration. It is a subject peculiarly and solely for legislative action. The legislature of this State has now acted by "express statute" so as to render communications of the character involved in the instant case privileged; but it had not so acted when the question as to their character arose in the trial court. The statute of 1815 did not by its terms make such communications privileged. It is not in our power to extend its meaning beyond that plainly expressed in the act. The fact that the legislature itself, at a subsequent time, felt it necessary to change its terms in order to give the statute a different meaning and a broader scope, is conclusive to our minds of the correctness of the conclusion we have reached.

For the foregoing reasons, we find no error in the action of the court below or in the judgment complained of, and the same will be affirmed.

*Affirmed.*