## SAFFORD v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. May 9, 1916.)

No. 113

1. CRIMINAL LAW ⬅1043(2)—APPEAL—OBJECTIONS.

Where testimony is inadmissible, and could not under any state of facts be rendered admissible, a general objection is sufficient to present for review the question of the admission of such evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2654; Dec. Dig. ⬅1043(2).]

2. CRIMINAL LAW ⬅417(10)—EVIDENCE—DECLARATIONS.

A woman, who charged that the prosecuting witness seduced her, was accused of using the mails with intent to defraud. Defendant was charged with perjury in identifying, at the examining trial before the United States commissioner, the prosecuting witness as the man who stopped with the woman at a hotel in which defendant was clerk. *Held,* that testimony of the prosecuting witness that a third person had visited him, and told him he was the man guilty of the seduction, and had promised to assist the prosecuting witness in defending a civil action brought against him by the woman, was hearsay, and was improperly received.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 950; Dec. Dig. ⬅417(10).]

3. WITNESSES ⬅287(4)—CROSS-EXAMINATION—REBUTTAL.

In such case, cross-examination of the prosecuting witness as to whether he had presented to his wife a man, stating that he was the one who took the excursion with the woman, and whether he had delivered to such

man letters written by the woman to him, did not justify the admission of the hearsay testimony as rebuttal.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1002; Dec. Dig. ⟨key⟩287(4).]

4. WITNESSES ⟨key⟩287(1)—CROSS-EXAMINATION—SCOPE.

In such case, where the prosecution brought out on cross-examination of the woman that she had admitted she falsely charged the prosecuting witness with her seduction, defendant is, on redirect examination, entitled to bring out her explanation, if any, for the statement, which the witness then testified was false.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 930, 1000; Dec. Dig. ⟨key⟩287(1).]

5. CRIMINAL LAW ⟨key⟩663—TRIAL—EXAMINATION OF DOCUMENTS.

Where the prosecution introduced in evidence a diary of the prosecuting witness to show that he could not have been at the place which accused, who was charged with perjury, had testified that he was, accused's counsel is entitled to examine the book to determine whether it is a diary.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1602; Dec. Dig. ⟨key⟩663.]

In Error to the District Court of the United States for the Southern District of New York.

Frank D. Safford was convicted of perjury, and he brings error. Reversed and remanded.

Slade & Slade, of New York City, for plaintiff in error.

H. Snowden Marshall, U. S. Atty., and Roger B. Wood, Asst. U. S. Atty., both of New York City.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

WARD, Circuit Judge. March 16, 1915, one Rae Tanzer instituted a civil suit for breach of promise against James W. Osborne, charging that under the name of Oliver Osborne he had seduced her under a promise of marriage. March 19th James W. Osborne swore to a complaint charging Rae Tanzer with a violation of section 215 of the United States Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [Comp. St. 1913, § 10385]) for using the United States mails to execute a scheme to defraud, upon which a warrant of arrest was issued, under which she was arrested. March 24th a hearing was held before a United States commissioner, at which the defendant, Safford, testified that in October, 1914, he was clerk of the Kensington Hotel in Plainfield, N. J., and that on the 18th of that month the person calling himself Oliver Osborne, accompanied by a lady, took a room together in the hotel, and he then and there identified James W. Osborne, who was present, as the person.

Thereafter the defendant was indicted under section 125 of the United States Criminal Code (section 10295) for falsely swearing that James W. Osborne was the man whom he saw as aforesaid. April 19th he pleaded not guilty, and his trial began April 27th, ending May 5th with a verdict of guilty and a recommendation for mercy. May 10th he was sentenced to a term of nine months and to pay a fine of

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

$1 and to stand committed in the New York County Penitentiary until the fine be paid. This is a writ of error to the judgment.

[1, 2] At the trial James W. Osborne was examined in rebuttal as follows:

"Q. Mr. Osborne, take the stand. A. (Witness complies.)

"Q. Mr. Osborne, on the day you swore out the complaint charging Rae Tanzer with using the mails in a scheme to defraud, was a letter—Exhibit— A. Mr. Wood, that was not in that shape. Give me the envelope, please—the white envelope.

"Q. Was the letter, Defendant's Exhibit R, delivered to you?

"Mr. Slade: I object to that as not a proper rebuttal, if your honor pleases. The witness' attention should be specifically directed to some specific question and he might be inquired of.

"The Court: I think the investigation into that exhibit is legitimate rebuttal.

"Mr. Slade: Exception.

"A. May I see the date of the complaint, please, that was made in this case?

"Q. (Hands witness paper.) A. On the 19th day of March, 1915, the paper, sealed up, was delivered to me at my house, the Sherman Square Hotel.

"Q. And was Exhibit—Defendant's Exhibit—R in the envelope which you now have?

"Mr. Slade: I object as incompetent, irrelevant, and immaterial—improper rebuttal.

"The Court: Overruled.

"Mr. Slade: Exception.

"A. The two papers, one of which is dated October 24, 1914, and the other paper dated Brooklyn, March 19, 1915, were in the envelope delivered to me.

"Q. Where were they delivered to you, Mr. Osborne? A. They were delivered to me in the parlor of my apartment at the Sherman Square Hotel.

"Q. Who was present? A. My wife was present, and also Mr. Wilcox, of my office.

"Q. Will you please state the circumstances under which those papers were delivered to you? A. I was called on the telephone—

"Mr. Slade: Wait a minute. Mr. Osborne, I object, if the court please.

"The Court: Please state the question. (Question read by the stenographer.)

"The Court: Overruled.

"Mr. Slade: Exception.

"A. I was called on the telephone, and somebody spoke to me on the telephone from my office, and— Shall I state the conversation?

"Q. It was not with anybody connected with your office? A. It was Mr. Kennarck, who has charge of our board, told me—

"Mr. Slade: I object.

"The Court: Sustained.

"Q. After that telephone conversation what happened? A. In consequence of that somebody came to my house.

"Q. Was it a man or a woman? A. It was a man.

"Q. Please describe him. A. I should say he was a man of at least half an inch or three-quarters taller than I was, with light eyes, of very fine features, I should say, very straight nose, I remember particularly, with hair I should say slightly lighter than my own, dressed in a gray overcoat, with very broad shoulders, and a trim figure. He did not have a big stomach at all. And in the presence of my wife he came into the room and his name was given.

"Q. What name did he give? A. He gave the name of Oliver Osborne and— Shall I state the conversation or not?

"Q. Yes, state the conversation.

"Mr. Slade: I object.

"The Court: Overruled.

"Mr. Slade: Exception.

"A. He said that he had read in the newspapers that this woman Rae Tanzer had accused me of having been around with her and having seduced her, and that he knew that I was a man of honor and character from what he

had read about me, and he was not going to allow a man of that type to suffer for anything that he himself done, and he said he came and stated these things in the presence of Mr. Wilcox and my wife—that he came for the purpose of exonerating me, and he said: 'I wrote you this letter in Brooklyn last night, and I intended to mail it to you.' You see there are two uncanceled stamps on it. 'But instead of that I came and delivered it to you myself in person.' He said, 'I am the man that has been going around with this girl;' and then he said, 'I want to have a talk with you privately and apart;' and he took me in the back room—that is, in my bedroom—left Mr. Wilcox and my wife in the front room, and before he went back into the back room I remember distinctly that I put both hands on his shoulders this way (indicating) and I looked into his eyes right straight, and I said, 'Well, you belong to the straight-nosed Osbornes, and not to the snub-nosed Osbornes, as I do,' because I noticed distinctly that he had such a fine nose. And we had some chat back and forth naturally, and I thanked him. I told him that I felt under the greatest possible obligations to him; that I thought it was a very honorable thing for a man to do. Well, he says, 'I am not married, and I paid this girl'—this is what he said to me in the back room—'I paid this girl every time I went with her.' And then, I said to him, 'Well, where did you go with her?' 'Well,' he said, 'I tell you, I went with her in various parts of New York,' but I remember a particular hotel on the East Side, over about Lexington avenue—I remember that he said that. Then I said, 'Well, look here.' He said to me, 'Is it any crime, this thing of going around with a girl in New York?' I said, 'Well, you are not married, and she is not married, and I don't know of it being a crime unless one of you are married.' He said, 'I don't think so, either.' Then I said, 'You tell me. He did tell me he had been out to New Jersey with her, and he said, 'If you will search near the station in Jersey, near the station, you will find some hotel that we were at.' 'Well,' I said, 'you don't mean to tell me you stayed with a girl in New Jersey, did you? How about the Mann Act?' I asked him. He was asking me, and I said, 'I want you to understand that you done this honorable thing by me and I would not get you into trouble for all the world.' 'Well,' he said, 'I had no sexual relations with her in Jersey.' I said, 'Are you sure of that?' He said, 'Yes, I am sure of it.' I said, 'If that is so, then the Mann Act cannot possibly have any application, either directly or indirectly to you.' And then I said to him, 'Well, I want you to go right down now and see the United States government; I want you to go right on down with me now and see Mr. Marshall;' and I said, 'This girl in my judgment has violated the laws of the United States, and she knows perfectly well that I cannot be the man, and no woman on earth could stay with a man two months and not know him; that is utterly impossible, and she knows it.' And I said, 'I want you to go right down with me to see Mr. Marshall;' and he said, 'No; that is utterly impossible; I cannot possibly do it.' He said, 'My employer has been good enough to let me come on here from Boston on some business of my own, and I have got to get back, or I will lose my job.' He told me, among other things, that he was a steamfitter by trade, and I thereupon took out a lead pencil and in the presence of— This was before I went into the back room. I am going back now to what happened in the presence of my wife and Mr. Wilcox. You will notice from the type of the writing it was written on no support practically, "222 West Newton street, near Huntington'—no, I think that is it. I can hardly read it. Q. Huntington avenue? A. 'Huntington avenue, Boston.' And I took also his business address on something. I have it written down in my office; those two addresses. He told me he was working for a man in Boston at the business address he gave me, and he said it was imperative for him to get back, and I did all I possibly could do to persuade him to come back; but he gave me his word of honor that he would meet me or be at the United States District Court, come to my office, go with me to Mr. Marshall's, at 4 o'clock the next afternoon, which would be Saturday, and with that the conference ended. Q. How long was he there? A. I think all this took about half an hour, I should say, sir. I do not think it was over that. Q. Was anything said, Mr. Osborne, in that conversation about letters this woman had written this man? A. Oh, he said— Yes, he did. He gave me this, and when I opened it, of course, I recognized at once

the handwriting and the paper as being of similar character to the one which was sent to me, as I remember it, on or about December 27th—after December 27th. And he said that he had other letters at home—no, I don't remember now whether he said they were in Boston or in his baggage. He told me that he had his baggage somewhere, and that he had either the letters there or in Boston; but he promised that he would get the letters and bring them down to Mr. Marshall, the United States District Attorney, the next day. That is my recollection substantially of all that occurred there.

"Mr. Wood: Now, I offer in evidence the other letter and the envelope delivered to Mr. Osborne at the time Exhibit R was delivered to him. (Marked Government's Exhibits Nos. 15 and 15-A.)

"Q. Mr. Osborne, do you remember anything else that was said in that conversation? A. I remember he spoke about his handwriting and I said you need not bother about that, you write much better than I do.

"Q. Is there anything else you can think of Mr. Osborne? A. No, I do not remember anything else except that he said he was born in New Hampshire."

Exhibits R and 15-A were as follows:

Defendant's Exhibit R.

"New York, October 24, 1914.

"Saturday Business.

"Dear Big Boy: Can't imagine how proud and happy I am to have a dear big boy like you call for me. Yes boy I sure do enjoy your company and hope it will continue so forever. Will it boy? Don't know how I miss you honey for I haven't been a bit happy since I last saw you. I want you to be true to me and trust me for I have given up every thought for the doctor and haven't seen him since I met you. I will do anything you want me to do for I love you and will do all in my power to make you happy.

"Hurt poor boy the other night but Honey I won't ever do it again (cross my heart). Sorry you weren't feeling well and I couldn't nurse you but never mind big boy. I will make up for it when I see you, will just love you oh so hard. Can't wait until the day is there so I could see my honey again. Love me and I will always be true to you.

"Your Sweetheart,                                   Only yours, Rae."

Government Exhibit 15-A.

"Brooklyn, March 19, 1915.

"Mr. James W. Osborne—Dear Sir: I saw last night by the paper, when I returned home, about this Rae Tanzer trying to make trouble for you. She has the wrong man in you, and is only after money. She knows she never saw you in her life, but she will try and say she did. She is a sport. I have been in a number of hotels here in the city with her, and each time I had to pay her before I went to the room. And about the trip to another state, it is Jersey, and the place is Plainfield; we went one Sunday afternoon, and only stayed about two hours—a hotel right near the station. She is a big liar to say all the things about you like that in the paper. Those three letters she says she has I gave her and am sending you one of the letters she gave me. I see she still works at the same place. I do not live in the city now. I am working in Boston. I only came to Brooklyn last night on business and must get back to-day. But will come to see you some day the last of this coming week. So do not worry about it. I will clear everything. By the way, I am a steamfitter and am not used to writing much, so try and make it out.

"Yours truly,                                    Oliver Osborne.

"Enclose please find her letter to me."

The foregoing testimony was obviously most damaging to the defendant, and, being the purest hearsay, should have been excluded upon a proper objection. Although the objection made was general, still it was sufficient, if the testimony was inherently inadmissible, or the objection could not have been obviated at the trial on any

ground. In Noonan v. Mining Co., 121 U. S. 393, at page 400, 7 Sup. Ct. 911, at page 914 (30 L. Ed. 1061), Mr. Justice Field said:

"2. The objection to the introduction of the articles of incorporation at the trial was that they were 'immaterial, irrelevant, and incompetent' evidence. The specific objection now urged, that they were not sufficiently authenticated to be admitted in evidence, and that the certificates were made by deputy officers, is one which the general objection does not include. Had it been taken at the trial and deemed tenable, it might have been obviated by other proof of the corporate existence of the plaintiff or by new certificates to the articles of incorporation. The rule is universal that, where an objection is so general as not to indicate the specific grounds upon which it is made, it is unavailing on appeal, unless it be of such a character that it could not have been obviated at the trial. The authorities on this point are all one way. Objections to the admission of evidence must be of such a specific character as to indicate distinctly the grounds upon which the party relies, so as to give the other side full opportunity to obviate them at the time, if under any circumstances that can be done. United States v. McMasters, 4 Wall. 680 [18 L. Ed. 311]; Burton v. Driggs, 20 Wall. 125 [22 L. Ed. 299]; Wood v. Weimar, 104 U. S. 786, 795 [26 L. Ed. 779]."

[3] The government seeks to justify the testimony on the ground that in the case in chief the defendant cross-examined James W. Osborne as follows:

"Q. Did you present to your wife a gentleman under the name of Oliver Osborne as the person that went with Miss Rae Tanzer to the Kensington— A. No; no.

"Q. The answer is no, you did not present such a person? A. Not as going to—what is the name—Kensington Hotel. I never heard of it at that time.

"Q. Did you present a person who posed as Oliver Osborne, as being the person who went with—

"Q. (continuing) —Miss Rae Tanzer to the Kensington Hotel? A. No; a man came to me, called Oliver Osborne; but I did not know at that time—I never heard of the Kensington Hotel.

"Q. And that was after you were sued? A. Yes, certainly. There was nothing in the suit about the Kensington Hotel.

"Q. Not a word? A. Not that I know of.

"Q. What became of that Oliver Osborne?

"Mr. Wood: I object to that.

"The Court: Sustained.

"Mr. Slade: Exception.

"Q. Did you present that person that designated himself as Oliver Osborne as the person that had relations with Rae Tanzer and for whom these letters were intended for?

"Mr. Wood: Don't answer. I object on the ground it is incompetent.

"The Court: Sustained.

"Mr. Slade: Exception.

"Q. You considered Oliver Osborne, the gentleman that came to see you, as a very important witness, did you not?

"Mr. Wood: I object.

"The Court: Objection sustained.

"Mr. Slade: Exception.

"Q. Do you know where this Oliver Osborne is?

"Mr. Wood: I object.

"The Court: Objection sustained.

"Mr. Slade: Exception.

"Q. Did you know the real name of the gentleman that posed as Oliver Osborne?

"Mr. Wood: I object.

"The Court: Objection sustained.

"Mr. Slade: Exception.

"Q. Do you know his present location?

"Mr. Wood: I object.

"The Court: Objection sustained.

"Mr. Slade: Exception.

"Q. Is it not a fact, Mr. Osborne, that you took that person designated as Oliver Osborne to your wife, and told him to say that he is the man with whom Rae Tanzer had relations? A. No.

"Q. Did you give to this Oliver Osborne a letter—one of the letters that you received? A. No.

"Q. Did you see a letter presented by this Oliver Osborne to your wife? A. He presented nothing to my wife."

The theory is that, the defendant having opened up the question of the conversation, the government was authorized to prove it. But the defendant did not open up the conversation, which was admitted over his objection and exception. The nearest he came to it was in asking James W. Osborne whether he had not previously to that conversation told Oliver Osborne to say that he was the guilty man in the conversation which subsequently took place between him, James W. Osborne, Mrs. Osborne, and Mr. Wilcox, and partly between Oliver and James W. Osborne, in the latter's private room. For this reason the case of People v. Buchanan, 145 N. Y. 1, 39 N. E. 846 on which the United States Attorney relies, does not apply. In it the witness was asked on cross-examination whether he had not suggested to the coroner something "about his inquiring about poison," and he answered, "No." On redirect the people were permitted to ask him to state the whole conversation which he had with the coroner. In other words, having on cross-examination been asked as to a conversation with the coroner, it was proper to ask him on redirect to state the whole of that conversation. Thus the situation will be seen to be a very different one. We think it was error to overrule the defendant's objection.

[4] At the trial it was brought out on the cross-examination of Rae Tanzer that the day after the hearing in the United States commissioner's office, as a result of which she was indicted, she admitted to a lawyer named Spielberg, and afterwards in a voluntary statement made in the United States Attorney's office which was taken down stenographically, that James W. Osborne was not Oliver Osborne. The government examined her at length with reference to this statement, but would not allow the defendant's counsel to look at it, would not offer it in evidence, or allow the defendant to do so. On redirect the defendant sought to bring out everything that the witness said when she made this statement in the United States Attorney's office. The record makes it perfectly clear that she wanted to explain why she said on the occasion of that statement that James W. Osborne was not the man who was with her at the Hotel Kensington. Whether he was or was not was a question of the most vital importance to the defendant. Then occurred the following:

"Q. You said in response to a question on cross-examination as to whether you were at the Sherman Square Hotel, and you said, 'Yes'? A. Yes.

"Q. And then you were asked as to whether you heard the telephone operator make certain statements, and you said, 'No, it was not true'? A. I did not hear it, but the starter told me that.

"Q. State to the court and jury all that was said on the subject.

"Mr. Wood: I object.

"The Court: Objection sustained.

"Mr. Slade: Exception.

"Q. Did you tell Mr. Wood the circumstances of that referred to in that letter? A. Yes; I did.

"Q. You told him all about it? A. Yes.

"Q. Now, tell his honor and the jury what you told Mr. Wood.

"Mr. Wood: I object.

"The Court: Objection sustained.

"Mr. Slade: It is my purpose to explain. I have no access to the notes, your honor.

"The Court: There is no reason why you should. The falsity is admitted.

"Mr. Slade: Yes, your honor; but the witness has stated——

"The Court: Falsity is falsity. That is an absolute. It is an absolute quantity. The witness is asked whether a certain statement which she has made is true. She says it is not. Now to cross-examine her would leave it there.

"Miss Tanzer, in your conversation with Mr. Wood, at the time this statement was made from which he read to you, did you tell him why you said that you thought that was not Mr. Oliver Osborne?

"Mr. Wood: I object.

"The Court: Objection sustained.

"Mr. Slade: Exception.

"Q. You testified that you tried to prevail upon your sisters to say that they made a mistake? A. Yes, I did.

"The Court: She has answered the question.

"Mr. Slade: I don't want to pursue this line, if your honor's ruling is that I cannot cross-examine this witness on the subject-matter that the learned District Attorney elicited upon cross, reading from a statement.

"The Court: The only matter that was raised by the District Attorney was this specific question; Did you say such a thing? and, Did you say such another thing?—the things themselves being in my judgment wholly immaterial; the only importance being that they were said by this witness. I don't see that you have a right to go into it.

"Mr. Slade: Am I right that, if the substance or subject-matter covered by the alleged statement contains a statement of fact, the witness should be permitted to explain, and state the circumstances under which it was made, so that the appropriate significance may be given to the fact itself? Now, my learned friend has taken out an extract of that statement and asked, Did you say so and so?

"The Court: It is a natural error, because you seem to forget about nine-tenths of the time that the defendant in this case is the man Safford.

"Mr. Slade: Yes, your honor; I appreciate it very much.

"The Court: Nobody appreciates it more keenly than I do.

"Q. Now, let me ask you, Miss Tanzer, now that you have replied to Mr. Wood's question that Mr. James W. Osborne is the man that you have referred to, is he the man that you have known as Oliver Osborne? A. Yes.

"Mr. Slade: That is all.

"(The witness steps down from the stand. Mr. Slade asks permission to have the witness resume the stand.)

"The Court: Now, we have heard quite enough. I think that the examination is closed. I decline to have her recalled. She has been fully examined. I think the matter is discretionary, and decline to have the young woman recalled.

"Mr. Slade: I submit that I have only asked the witness on cross-examination about four questions.

"The Court: You may call another witness, and if you have any further questions to ask Miss Tanzer, you may propound them in writing, and I will consider it over recess.

"Mr. Slade: I decline to do so, if your honor please.

"The Court: Very well, we will consider that she has been examined and dismissed. I decline to have her recalled.
"Mr. Slade: Your honor allows me an exception.
"The Court: Yes."

It was precisely because Safford, and not Rae Tanzer, was being tried, that Safford had a right to draw from her anything which would show that of her two irreconcilable accounts her statement in the United States Attorney's office was untrue and her testimony at the trial true. We think it was error to restrict him in this regard.

[5] We also think it was error to restrict the defendant's examination of Mr. Osborne's office diary to the single page for October 18, 1914. The following occurred in respect to this:

"Mr. Marshall: If your honor please, we offer the entry in the diary, and they are going over the entire book.
"The Court: Are you looking at the rest of that diary?
"The Witness: I have seen them.
"The Court: You hand the diary to the clerk.
"Mr. Slade: Your eyesight is very poor, Mr. Marshall.
"The Court: Hand the diary to the clerk. The diary will be kept open at the page at which it has been offered in evidence, and counsel may examine it at the clerk's desk.
"Mr. Slade: I take an exception to your honor's observations, if the court please.
"The Court: You will go on now.
"Mr. Slade: And I want to have the record complete with your honor's permission. We have a right—I have not looked at the diary, but we have a right, and I now claim the right, to examine that diary, for the purpose of cross-examining the witness in respect to entries.
"The Court: You have a right to examine the diary in so far as it has been offered in evidence.
"Mr. Slade: So that your honor limits me to the page?
"The Court: I do.
"Mr. Slade: Your honor will allow us the benefit of an exception.
"The Court: And it will furthermore be noted upon the record, if it is not noted upon the record, that the ruling is made upon the objection or application, both of the counsel for the government and of the witness on the stand, to the effect that cross-examining counsel was seen to turn over the pages of the diary other than the page which had been offered in evidence.
"Mr. Engel: If the court please, that is directed against me. I was handing the book over to Mr. Slade, and the leaf slipped. I was telling him something about—
"Mr. Slade: I want to show your honor I had not looked at it when Mr. Marshall jumped up.
"The Court: You will please go on.
"Mr. Slade: I except to the remark of counsel for the government, Mr. Wood, in saying the jury saw it all. That comment is improper.
"The Court: Yes. You may proceed."

We think the defendant was entitled to a general examination of the book, to test under the supervision of the court whether it really was a diary, and regularly kept, and by whom kept.

We cannot say to what extent the jury was influenced by the testimony as to the conversation which Oliver Osborne had with James W. Osborne and others, nor how their minds might have been affected in respect to the statement made by Rae Tanzer in the United States Attorney's office, if she had said that she made it, for example, in the hope of getting herself and her sisters and her counsel free of the

indictments found against them. The government insists that the other evidence in the case was so overwhelming against Safford's identification of James W. Osborne that these rulings were harmless. Without going further into the record, it is enough for us to say that the defendant had a right to be tried and convicted in accordance with the rules of law.

The judgment is reversed.