## HOLLINGSWORTH V. STATE.

Decided July 5, 1890.

1. *Criminal evidence—Impeaching witness—Interest in conviction.*

It is competent in a criminal case to prove that a material witness for the State had said that he was working for a reward offered for the conviction of the criminal.

2. *Impeaching a witness on cross-examination.*

Where a witness on cross-examination, in answer to questions touching his residence and occupation, discloses that he has no fixed residence, but follows a lewd woman with whom he lives, and that he has no regular pursuit, but devotes his time to fighting and gambling, it is error to charge the jury that proof that any witness had been guilty of gambling, fighting and unlawful cohabitation did not affect his credibility.

3. *General reputation of witness—Rebuttal.*

Proof of the general reputation of a witness cannot be rebutted by showing that such reputation was not deserved.

4. *Impeaching witness—General reputation.*

An instruction which restricts the evidence impeaching the general reputation of a witness to his truthfulness, to the exclusion of his morality, is erroneous.

APPEAL from *Jefferson* Circuit Court.

J. M. ELLIOTT, Judge.

The appellant seeks to reverse a conviction of the crime of arson. The opinion states the facts necessary to its correct understanding.

*Williams & Austin, Met. L. Jones* and *M. L. Bell* for appellant.

*W. E. Atkinson*, Attorney General, and *T. D. Crawford* for appellee.

Argued the case orally.

HEMINGWAY, J. Two causes for reversal are presented for our consideration.

1. Criminal evi-
dence –Impeach-
ing witness—In-
terest in convic-
tion.

1.   A witness, introduced by the State, and who gave material testimony in its favor, was asked by the appellant, whether he knew that a reward of $1,000.00 had been offered for the conviction of any person who burned the house, the subject of the alleged arson.   He answered that he had no such information, and knew nothing of the offering of any reward.   The appellant introduced a witness, by whom he offered to prove that the State's witness had told him, after the burning, that he was working for the reward.   The evidence was objected to by the State on the ground that it was immaterial, and excluded by the court on the ground that no foundation had been laid for its introduction.

Proof only that a reward had been offered would be immaterial; but if such proof were supplemented by further proof that the State's witness expected a benefit therefrom, it would disclose that such witness had an interest in the result of the controversy.   It would tend to prove bias on part of the witness, and the motive that might actuate him in delivering his testimony.   The bias of a witness is not immaterial.   Proof of interest does not disqualify one to testify; but pecuniary interest, personal affection or hostility, sympathy or animosity, may always be shown to discredit a witness.   1 Whart., Ev., secs. 408, 561, 566; 1 Greenl., Ev., sec. 450 and note; *Crumpton v. State*, 52 Ark., 274; *Butler v. State*, 34 Ark., 480; *Cornelius v. State*, 12 Ark., 792; Whart., Crim. Ev., sec. 485.

The appellant should have been permitted to prove that the witness had an interest and bias in the cause, by his statement disclosing it.   Whether he could make such proof by those who heard the statement, without first interrogating the witness concerning it, we need not decide.   Such would have been the better practice, and should be observed where it is practicable.   That it must be followed we do not hold, for highest authorities upon the subject differ.   *McGinnis v. Grant*, 42 Conn., 77; *Cornelius v. State*, 12 Ark., 792;

*Frazier v. State*, 42 Ark., 70; *Martin v. Barnes*, 7 Wis., 239; *New Portland v. Kingfield*, 55 Me., 172; *McHugh v. State*, 31 Ala., 317; *Edwards v. Sullivan*, 8 Ire. L., 302; *Day v. Stickney*, 14 Allen, 255; 1 Whart., Ev., sec. 566; 1 Greenl., Ev., sec. 450 and note.

The same state of case will not likely arise on a retrial, and, as we have not enjoyed the benefits of argument by counsel upon the point indicated, we deem it best to take no position in that regard.

2. The court in effect charged the jury, that proof that any witness or witnesses had been guilty of gambling, fighting and unlawful cohabitation, did not in any manner affect the credibility of such witness or witnesses.

2. Impeaching a witness on cross-examination.

Two witnesses for the State, comparative strangers to appellant, testified that he solicited them to commit the arson; that they declined his proposal, and he thereupon invited them to go with him to the house, saying that he would burn it himself; that they accompanied him very near to the house, saw him go to it, and then saw the building burn down; that they never disclosed any of the above fact for several months. On cross-examination, one of the witnesses was asked where he had resided, and what occupation he had followed at a time near the alleged arson. His reply disclosed, that he resided in the city of Pine Bluff, without regular employment, living in unlawful cohabitation with a woman who worked as a menial in different families, and that he moved about with her as she changed her place of employment. The other of said witnesses, in answer to the same question, stated that he had resided in Marianna about a year before the house-burning, and that his occupation was to "fight and sometimes to shoot a little craps." This is the insight which those witnesses gave of their own past lives, and upon their testimony the State relied for a conviction.

It may be conceded that the scope of legitimate cross-examination is not clearly defined. It rests largely in the

discretion of the trial court.   Mr. Stephen, in his Digest of
the law of Evidence, art. 129, after treating the right to
cross-examine as to matters brought out in the direct exami-
nation, says:    "When a witness is cross-examined, he may,
in addition to the questions herein before referred to, be
asked any questions which tend, (1) to test his accuracy,
veracity, or credibility; or (2) to shake his credit, by in-
juring his character."   We are not called to approve the rule
stated so broadly, but it is always competent to interrogate
a witness on cross-examination touching his present or recent
residence, occupation and associations; and if, in answer to
such questions, the witness discloses that he has no residence
or lawful occupation, but drifts about in idleness from place
to place, associating with the low and vicious, these circum-
stances are proper for the jury to consider in determining his
credibility.   That such a life tends to discredit the testimony
of the witness, no one can deny; when disclosed on cross-
examination, it is exclusively for the jury to determine,
whether any truth can come from such source, and if so,
how much.   The right to impair the evidence of a witness
by cross-examination must not be confounded with the right
to impeach a witness by evidence introduced by the opposite
party.   The former may be exercised within a more extended
range than the latter.   Speaking on this subject, the Court
of Appeals of New York has said:    "It is well settled, that
for the purpose of impairing the credit of a witness, by evi-
dence introduced by the opposite party, such evidence must
go to his general character.   That proof of specific acts of
immorality is not competent, see authorities cited in *New-
comb v. Griswold*, 24 N. Y., 298; 1 Greenleaf, sec. 461.
Yet it is held, that for the purpose of discrediting his testi-
mony, the witness may be asked upon cross-examination, as
to specific acts.   (*Id.*, sec. 456.)   This shows that upon a
cross-examination of a witness, with a view of testing his credi-
bility, inquiries are proper as to facts not competent to be

proved in any other way. Such inquiries do not relate to the issue directly upon the trial, but relate only to the credibility of the witness. They are entirely collateral to the principal issue. As to the former, the same strictness is not required when the evidence is confined to the cross-examination of the witness introduced by the opposite party. In such examination the presumption is strong that the witness will protect his credibility as far, at least, as truth will warrant. All experience shows this to be so. It would be productive of great injustice often, if where a witness is produced, of whom the opposite party has before never heard, and who gives material testimony, and from some source, or from the manner and appearance of the witness, such party should learn that most of the life of the witness had been spent in jails, and other prisons for crimes, if this fact could not be proved by the witness himself, but could only be shown by records existing in distant counties, and perhaps States, which for the purposes of the trial, are wholly inaccessible. No danger to the party introducing the witness can result from this class of inquiries, while their exclusion might, in some cases, wholly defeat the ends of justice. My conclusion is, that a witness upon cross-examination, may be asked whether he has been in jail, the penitentiary or State prison or any other place that would tend to impair his credibility, and how much of his life he has passed in such places. When the inquiry is confined as to whether he has been convicted, and of what, a different rule may perhaps apply." *Real v. People,* 42 N. Y., 270.

The Supreme Court of Michigan on the same subject says: "It has always been found necessary to allow witnesses to be cross-examined, not only upon the facts involved in the issue, but also upon such collateral matters as may enable the jury to appreciate their fairness and reliability. To this end a large latitude has been given, where circumstances seem to justify it, in allowing a full inquiry into the history

of witnesses, and into many other things tending to illustrate their true character. This may be useful in enabling the court or jury to comprehend just what sort of person they are called upon to believe, and such knowledge is often very desirable. It may be quite as necessary, especially where strange or suspicious witnesses are brought forward, to enable counsel to extract from them the whole truth on the merits. It cannot be doubted that a previous criminal experience will depreciate the credit of a witness to a greater or less extent, in the judgment of all persons, and there must be some means of reaching this history. The rules of law do not allow specific acts of misconduct or specific facts of a disgraceful character to be proved against a witness by others. He may be proved by record evidence to have been convicted of infamous crimes, but not to have done other infamous deeds, nor to have undergone personal disgrace. And even as to previous conviction of infamous crimes, the rule is seldom of any great service, because no one can be expected to know in advance what witnesses may appear, nor what may have been their history. Unless the remedy is found in cross-examination, it is practically of no account.

"It has always been held that within reasonable limits a witness may, on cross-examination, be very thoroughly sifted upon his character and antecedents. The Court has a discretion as to how far propriety will allow this to be done in a given case, and will or should prevent any needless or wanton abuse of the power. But within this discretion, we think a witness may be asked concerning all antecedents which are really significant, and which will explain his credibility." *Wilbur v. Flood*, 16 Mich., 40. *Vide Newcomb v. Griswold*, 24 N. Y., 298; 1 Greenl., Ev., secs. 446, 456-8-9-60; Whart., Cr. Ev., sec. 474.

We do not now hold that a witness may be asked on cross-examination, whether he has been guilty of gaming, fighting and unlawful cohabitation. The case is not pre-

sented.   But when a witness on cross-examination, in an-
swer to questions touching his residence and occupation, dis-
closes that he has no fixed residence, but moves about when-
ever a lewd woman with whom he lives moves, and that he
had no regular pursuit, but devotes his time to fighting and
crap shooting—in such a case we do hold that such answers
shed an important light on the character of the witness,
proper for the jury's guidance in determining the value of
his evidence.

To impeach those witnesses, the appellant introduced a
number of others, who testified that they were acquainted
with the general reputation of said witnesses, in the neighbor-
hood in which they lived, for truth and morality; that such
reputation was bad; and that the impeaching witnesses would
not believe them under oath.   The State, on cross-examina-
tion, sought to break the force of the impeaching evidence
by showing that the bad reputation of the witnesses assailed
grew out of their habits with reference to the particular kinds
of immorality indicated in the court's charge.   The appel-
lant could not impeach the State's witnesses by proof that
they were guilty of particular immoral acts, or addicted to
any particular immoral habit, except lying.   He was required
to prove that their general reputation for truth and morality
was bad.   The State could not meet proof of the general
bad repute of its witnesses, by showing that their bad repute
was not justified by their conduct and lives, and that they
deserved good reputations.   What gave rise to the reputa-
tions testified to, was not the subject of legitimate inquiry.
The questions were (1) did the witnesses have a general
reputation where they lived for truth and morality?   And (2)
was it good or bad?   The inquiry was as to the opinion of
the public, but did not concern the justice or injustice of
such opinion.   The witnesses had stated that they knew
what the public opinion was, and that it was unfavorable.
Their cross-examination should have been directed to dis-

3. Rebutting proof of general reputation.

crediting those statements, and it might have been done, by showing either that the witnesses testifying did not know the general reputation of those assailed, or if they did, that they had misstated it. It would extend controversies beyond all reason, if it were permitted to inquire, not only as to the reputation of every witness introduced in a cause, but also as to the justice or injustice of the public in fixing its opinions of their character. What conduct shall win bad repute, depends upon the judgment of the public, whose opinions make reputations; what effect a bad reputation shall have upon the testimony of a witness in a trial at law, is a matter for the sole determination of the jury. Where general reputation is proved, it does not rest with a court to say that it shall have no effect because it is undeserved; and where a witness, in the course of his own examination, discloses that he lives in idleness and crime, courting the society of the lawless and degraded, it is for the jury, and it alone, to say how far his statements shall be discredited thereby. The instruction, therefore, invaded the province of the jury.

It is not for us to say whether, on the proof, the defendant is guilty or innocent. That prerogative the law has wisely placed elsewhere; but the testimony of the assailed witnesses presents a strange case, involving many circumstances to excite surprise, and a jury should be allowed to give it rigid scrutiny, and decide it as they believe justice and the facts demand, without any instruction restricting their right to weigh and judge the evidence.

4. Impeaching witness — General reputation. In this State a witness may be impeached by proof that his general reputation for truth and morality is bad. By the seventh instruction, given on behalf of the State, impeaching evidence was restricted to general reputation for truth and veracity, excluding morality. For that reason, if no other, it does not aid instruction number six, which should not have been given.

For the error indicated in giving the sixth instruction on part of the State, the judgment will be reversed, and the cause remanded for a new trial.