## LINDSEY v. UNITED STATES.
### No. 8091.

United States Court of Appeals for the District of Columbia.

Decided Dec. 1, 1942.

Messrs. James G. Tyson and Richard R. Atkinson, both of Washington, D. C., for appellant.

Mr. Dennis McCarthy, Assistant United States Attorney, of Washington, D. C., with whom Mr. Edward M. Curran, United States Attorney, and Mr. Charles B. Murray, Assistant United States Attorney, both of Washington, D. C., were on the brief, for appellee.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice.

The appellant was charged in separate indictments by the grand jurors of the United States in and for the District of

Columbia with rape upon one Joyce E. Smith (Criminal No. 68,168 in the District Court of the United States for the District of Columbia), and assault with intent to kill upon one Lawrence E. McCullough (Criminal No. 68,169 in the District Court). To each indictment he pleaded not guilty. Upon agreement of counsel and order of the District Court the two charges were consolidated for trial. A verdict of guilty was returned upon each indictment on October 9, 1941. To the verdict of guilty in the rape charge the jury added the words "with the death penalty." On October 31 sentence of death by electrocution was imposed by the District Court under the verdict of rape and sentence of five to fifteen years' imprisonment in the penitentiary under the verdict of assault with intent to kill. From these judgments the appellant appeals to this court. He assigns numerous errors of which it is necessary to discuss only those mentioned below. I think there should be reversal of both convictions because of denial of the appellant's right of cross-examination and because of erroneous instructions. I think also that the court should certify to the Supreme Court the question raised by the appellant as to the constitutionality of D. C.Code (1940) § 22—2801.

■■■ 1. The efficacy of cross-examination as a test of the dependability of testimony is too well understood to require extensive explanation. Evidence supplied through the lips of witnesses is subject to the possible infirmities of falsification or bias and the inaccuracies which flow from fallibility of human powers of observation, memory, and description. The annals of the legal profession are filled with instances in which testimony, plausible when supplied on examination in chief, has by cross-examination been shown to be, for one or more of the reasons mentioned, faulty or worthless. So definitely, indeed, has the efficacy of cross-examination as a weapon for the discovery of truth been recognized in our system of law that cross-examination is held to be a right, not a mere privilege. It is often stated that the control of cross-examination is within the discretion of the trial judge, but it is only after a party has had an opportunity substantially to exercise the right of cross-examination that discretion becomes operative.

■■■ In respect of such things as needless protraction, conduct of an examination in a manner unfair to a witness, undue inquiry into collateral matters to test credibility, and the like, cross-examination is properly within the discretion of the trial judge, and there can be no reversal except for abuse. But the distinction between limitation of cross-examination in such respects and denial of the right of cross-examination is clear and well established. The distinction is well put in Heard v. United States, 8 Cir., 1919, 255 F. 829, in an opinion by Sanborn, Circuit Judge:

" . . . *A full cross-examination of a witness upon the subjects of his examination in chief is the absolute right, not the mere privilege, of the party against whom he is called,* and a denial of this right is a prejudicial and fatal error. It is only after the right has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary. Gilmer v. Higley, 110 U.S. 47, 50, 3 S.Ct. 471, 28 L.Ed. 62; Resurrection Gold Mining Co. v. Fortune Gold Mining Co. [8 Cir.] 129 F. 668, 674–676, 64 C.C. A. 180, and cases there cited; Safford v. United States [8 Cir.] 233 F. 495, 501, 503, 147 C.C.A. 381. . . ." [Italics supplied] [255 Fed. at page 832].

The Supreme Court of the United States has made a like declaration of the law in Alford v. United States, 1931, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. In that case, in an opinion by Mr. Justice Stone, the Court said:

"*Cross-examination of a witness is a matter of right.* The Ottawa, 3 Wall. 268, 271, 18 L.Ed. 165. Its permissible purposes, among others, are that the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood, cf. Khan v. Zemansky, 59 Cal.App. 324, 327 ff., 210 P. 529; 3 Wigmore, Evidence (2d ed.) § 1368 I. (1) (b); that the jury may interpret his testimony in the light reflected upon it by knowledge of his environment, Kirschner v. State, 9 Wis. 140; Wilbur v. Flood, 16 Mich. 40, 93 Am.Dec. 203; Hollingsworth v. State, 53 Ark. 387, 14 S.E. 41; People v. White, 251 Ill. 67, 72 ff., 95 N.E. 1036; Wallace v. State, 41 Fla. 547, 574 ff., 26 So. 713; and that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased. Tla-Koo-Yel-Lee v. United States, 167 U.S.

274, 17 S.Ct. 255, 42 L.Ed. 166; King v. United States [5 Cir.] 112 F. 988; Farkas v. United States [6 Cir.] 2 F.2d 644; see Furlong v. United States [8 Cir.] 10 F.2d 492, 494.

"Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. Knapp v. Wing, 72 Vt. 334, 340, 47 A. 1075; Martin v. Elden, 32 Ohio St. 282, 289. *It is the essence of a fair trial that reasonable latitude be given the cross-examiner,* even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and *put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.* Tla-Koo-Yel-Lee v. United States, supra; King v. United States, supra; People v. Moore, 96 App.Div. 56, 89 N.Y.S. 83, affirmed without opinion, 181 N.Y. 524, 73 N.E. 1129; cf. People v. Becker, 210 N.Y. 274, 104 N.E. 396. To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, *is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.* Nailor v. Williams, 8 Wall. 107, 109, 19 L.Ed. 348; see People v. Stevenson, 103 Cal.App. 82, 284 P. 487; cf. Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L. Ed. 345. In this respect a summary denial of the right of cross-examination is distinguishable from the erroneous admission of harmless testimony. . . .

"The *extent* of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. *It may exercise a reasonable judgment in determining when the subject is exhausted.* Storm v. United States, 94 U.S. 76, 85, 24 L.Ed. 42; Rea v. Missouri, 17 Wall. 532, 542-543, 21 L. Ed. 707; Blitz v. United States, 153 U.S. 308, 312, 14 S.Ct. 924, 38 L.Ed. 725. But no obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self-incrimination, properly invoked. There is

a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him. [President, etc., of Third] Great Western Turnpike [Road] Co. v. Loomis, 32 N.Y. 127, 132, 88 Am.Dec. 311; Wallace v. State, supra; 5 Jones, Evidence (2d ed.) § 2316. But no such case is presented here. *The trial court cut off in limine all inquiry on a subject with respect to which the defense was entitled to a reasonable cross-examination. This was an abuse of discretion and prejudicial error.* Tla-Koo-Yel-Lee v. United States, supra; Nailor v. Williams, supra; King v. United States, supra; People v. Moore, supra; cf. People v. Becker, supra. . . ." [Italics supplied] [282 U.S. at pages 691–692-694, 51 S.Ct. at pages 219, 220, 75 L.Ed. 624].

In the Alford case, where the charge was use of the mails to defraud, a Government witness on examination in chief gave testimony damaging to the accused with respect to various transactions, including conversations between the accused and the witness and statements made by the accused to third persons. For the purpose of discrediting this testimony, the accused's counsel sought to cross-examine the witness as to his place of residence, insisting that the jury was entitled to know who he was, where he lived, and what his business was. In particular, counsel sought to bring out that the witness was in the custody of the Federal authorities, this for the purpose of showing whatever bias or prejudice he might have. Denial of this cross-examination by the trial court was affirmed in the Circuit Court of Appeals. The Supreme Court reversed on the sole ground of the denial of the right of cross-examination. In view of the fact that the cross-examination in the Alford case went to collateral matters touching credibility, whereas the cross-examination denied in the instant case, was, as will appear below, directed to a critical issue, the recognition of the Alford case that cross-examination is a matter of right applies with great force.

Against the charges for which he was on trial, the appellant relied primarily upon the defense of insanity. In his behalf, through the testimony of expert witnesses, evidence was introduced to the effect that he was, and ever since his childhood had been, an imbecile and the victim of a psychosis manifested by auditory and visual

hallucinations; the same experts testified that in their opinion the appellant, at the time of the acts charged to have been criminally committed by him, was unable to appreciate the moral quality of his conduct. To meet this evidence, the Government called to the witness stand two experts, who testified in chief that in their opinion the appellant was of sound mind at the time of the acts in question, that he was then able to appreciate the moral quality of his conduct, and that he was not mentally deficient and the subject of a psychosis with hallucinations. They fortified their statements, moreover, by asserting that psychotic conditions are of but passing duration in imbeciles. Obviously, if this testimony of the Government's experts was to be regarded by the jury as dependable, the appellant's defense of insanity would be materially impaired. In these circumstances, counsel for the appellant sought to cross-examine the Government's experts upon the subject of the duration of psychotic conditions imposed upon mental deficiency. Specifically, counsel sought to bring to the attention of one of the experts for the Government the asserted fact that in St. Elizabeths Hospital in the District of Columbia there had been a number of cases of mental deficiency with psychosis, in which the psychotic condition had persisted over long periods of years. While the questions were somewhat awkwardly put, they were clearly intended to test the dependability of the Government's evidence to the effect that psychotic conditions imposed upon mental deficiency were temporary. Upon objection by the Government, the right to pursue this examination was denied.

In respect of the subject of the appellant's asserted mental deficiency since childhood, the experts called in his behalf testified that they had subjected him to standard tests for mental age and that these showed him to have a mental age of approximately six years, although he was nineteen years of age at the time of the crimes charged. It was shown that the experts for the Government participated in these tests. After the latter experts had testified in chief that in their opinion the appellant was of sound mind and able to appreciate the moral quality of his conduct, they were asked on cross-examination by the appellant's counsel what age the appellant was disclosed to be by these tests. They admitted that the age shown by the tests was approximately six years, but they asserted that the tests were undependable because, in their opinion, the appellant was, as one of the experts put it, malingering, and the other unco-operative, at the time of the tests. On further cross-examination upon this subject, the experts for the Government said that they based their statements concerning malingering and lack of co-operation upon the fact that the appellant had given on separate occasions—one of the tests was made partly on one day and partly on another—inconsistent answers to simple questions. It was stated also by one of the Government's experts, as a basis for his conclusion that the mental tests were not really indicative of the appellant's actual mental age, that at the time he was being examined he had a strong motive to falsify answers, i. e., in order to aid in establishing that he was insane. It had been proved in the case in the appellant's behalf, by records of the Crownsville State Hospital, a Maryland institution for the insane, that he had, approximately six months prior to the date of the acts charged in the instant case as criminal, been committed to the Crownsville Hospital for a psychotic condition accompanied by auditory and visual hallucinations, and that he had there been examined and his mental condition made the basis of an extensive record, and that at the end of eighteen days he had been paroled, not discharged. These records showed also that the appellant gave inconsistent answers to simple questions put to him by doctors at the Crownsville Hospital. In these circumstances, counsel for the appellant sought on further cross-examination to confront each of the experts for the Government with the fact that the appellant had thus given inconsistent answers to simple questions on another occasion in which his mental capacity was under examination and when he must have been under a motive not to falsify but to tell the truth—in order to be released as sane. Obviously, the purpose of this cross-examination was to test, in the presence of the jury, the dependability of the basis upon which the Government's experts had reached the conclusion that the appellant was malingering at the mental tests in which they participated. Objection interposed by the Government to this cross-examination was sustained by the court.

On cross-examination by appellant's counsel of one of the Government's experts, he admitted that he had received informa-

tion that the appellant had been sent to the Crownsville Hospital "in January preceding the July in which the crimes charged were committed and had remained there about five weeks and that he had then been paroled and later discharged as improved"; but the witness stated that he had learned this not as the result of an independent inquiry of his own but from the statement, which he had accepted, of an Assistant United States Attorney. He was then asked by appellant's counsel whether or not it would affect his opinion of the appellant's mental condition if he, the witness, were informed that the appellant, instead of being first a parolee and then discharged from the Crownsville Hospital, was still a parolee as of the time of the criminal trial. The witness answered that that would make no difference, that he did not care how the appellant was recorded at the Crownsville Hospital if he himself, the witness, having examined him, found him of sound mind. Counsel for the appellant then asked the following question:

"Now, I ask this question, if the Crownsville Institution had declared this man insane or in a psychotic condition, and he was later, notwithstanding that finding of Crownsville Institution, called on to examine the man, would he disregard completely the Crownsville inquisition, and he himself would then go on the basis that the man was of sound mind?"

The court, treating an interruption by Government counsel to the effect that "Crownsville said he is sound" as an objection to the question, forbade an answer unless the witness was first shown the Crownsville Hospital file, which was in evidence. This question was obviously intended to demonstrate, if it was answered in the affirmative (as the prior statement of the witness indicated it might well be), that the expert was unwilling to consider a diagnosis of the appellant by the Crownsville mental hospital as insane or psychotic as bearing upon his mental condition at the time of the acts charged in the instant case. Such an answer would have weakened the force of the expert's testimony in chief upon the subject of the appellant's mental condition, for the reason that it would have indicated an unwillingness to consider all available data of a scientific nature bearing upon the condition of the appellant's mind. It is true that the answer to the previous similar, though less specific question, technically remained in the record, but the action of the court, in my view, in effect told the jury that the answer to neither of the questions was material for their consideration.

The cross-examination, thus in three instances limited by the trial court, went to the crucial question was the appellant a psychotic imbecile unable at the time of the acts charged against him to appreciate the moral quality of his conduct. If the jury believed from the evidence that the answer to that question was in the affirmative, it was their duty to find the appellant not guilty by reason of insanity; but if the jury were convinced beyond a reasonable doubt that the answer was in the negative, then their verdict upon the issue of sanity must be in favor of the Government. As will have been noted in the quotations from the cases cited above, it could not properly be assumed by the trial court—and it cannot properly be assumed by this court on appeal—that the cross-examination would, if the appellant's counsel had been allowed to pursue it, have been unsuccessful in its attack upon the dependability of the evidence supplied through the lips of the experts for the Government.

It should always be borne in mind that, while the prosecution of a criminal case is properly to be conducted with vigor, as is also its defense, a trial is neither a game nor a battle, but is a search for the truth in respect of the issues of fact involved. That being so, neither Government nor defense can properly interfere with the substantial right of cross-examination of the other's witnesses. I think there was improper interference by the Government in the three instances above described and that the trial court erroneously limited the examination.

2. The trial judge's instruction to the jury on the issue of the appellant's specific intent to kill Lawrence E. McCullough in effect enumerated the items of evidence relied upon by the Government as tending to prove the existence of such an intent. The court referred to the use of a rock or brick or a razor blade or some other sharp instrument by the appellant upon McCullough, and to the appellant's making of threats to kill McCullough at the time of the altercation between them. I set out in the margin the terms of the instruction

so far as here pertinent.[1] But the instruction omitted to mention the items of evidence which tended to support the appellant's contention, under his plea of not guilty, that he made no assault with intent to kill upon McCullough. There was testimony in the record by a police officer (Scott) that the appellant had stated that "if he [McCullough] had not jumped on me there, I would not have been in trouble there," and to the effect that "he [McCullough] jumped on me and there was a tussle." Also, one of the experts for the appellant (Williams) testified that the appellant had told him that he "made to go in her [Joyce Smith's] direction when the soldier hit him and he said I whipped him." Also, it was testified by Joyce Smith that the appellant said "to send Lawrence home in a taxicab" and that he "told us not to go down in the woods, that there were so many hoboes in the woods, and he said they might start something. . . ." Also, Joyce Smith testified that the appellant "did not seem to be angry"; that there were "no high-pitched voices in the conversation." That these items proceeded in part from the witnesses for the Government, and in part from statements of the appellant to one of his experts which were repeated by the expert on the witness stand without objection by the Government, could not deprive the appellant of such benefit as they might be to him on the issue of specific intent to kill. Each of the parties to a criminal trial is entitled to the benefit of any evidence in the case which tends to prove his contentions, and this without regard to the source of the evidence. It is true that these items of evidence in the appellant's favor on the issue of specific intent are not highly persuasive. But it cannot be said that they were irrelevant to the issue of specific intent or so remote as to

[1] In instructing upon the subject of specific intent to kill, the trial court first said that it was admitted that the appellant struck McCullough with either a rock or a brick, and that he did cut him with a sharp instrument, but upon objection of appellant's counsel that "there is no evidence as to what he was hit with or cut with anything, except that he was cut," the court withdrew this statement. After that the court said "You have the evidence as to what did happen to McCullough, and you have this statement which the defendant made to the doctor" (this refers to the appellant's description to one of his experts of what took place between him and McCullough). The court then went on as follows:

" . . . If you find that the defendant did inflict violence upon McCullough, then you will determine whether there was an intent to kill, and whether what was done was done unjustifiably and without excuse.

"Now, as to the intent to kill, the Government must prove that there was a specific intent in order to find the defendant guilty as indicted, that is, they must prove not only the infliction of the violence, but that at the time of doing that, the defendant had a specific intention to kill McCullough.

"You are instructed that in indictment No. 68,169, that is, assault with intent to kill, the Government must prove an assault with specific intent to kill, that is say, in addition to proving an assault committed by the defendant upon the person of the prosecuting witness, the Government must also prove a specific intent to kill him. There is an inference that a man intends, the natural and necessary consequences of his act, and in determining the intent of the defendant, this inference is entitled to such weight as you may choose to give it, but it is not conclusive on that question. This inference, however, is not enough to prove a specific intent. That is, if you find that the defendant struck McCullough with the rock or the brick and cut him with a razor blade or some other sharp instrument, there is an inference that the intent is the natural consequence of those acts, and if you believe that the natural consequences of those acts would be death unless McCullough was rescued in time to prevent death and before it could ensue, then you are entitled to take that inference into consideration in deciding whether there was a specific intent to kill. It is not conclusive that there was specific intent, nor is it alone sufficient to show a specific intent. In this particular case, the Government contends that there were threats and that the entire evidence shows an actual intent to kill McCullough so that he would not be able to interfere and that the defendant might then commit rape upon Joyce Smith. Those are the contentions on [sic] the Government.

"Upon all of the evidence, it is for you to say whether or not the specific intent to kill has been established beyond a reasonable doubt. If so, and the other elements of the assault had been established, your verdict on this indictment should be guilty as indicted; but if the intent to kill has not been shown beyond a reasonable doubt, then your verdict may be guilty of simple assault."

be unworthy of consideration. That being true, the question of cogency was for the jury, not for the court, and the instruction ought to have mentioned them.

Again on the issue of self-defense, the instruction of the court to the jury was out of balance: There had been no specific written request by the appellant for an instruction on self-defense, and there was no argument to the jury on that subject. Nevertheless, the trial court volunteered to instruct on self-defense, and the Government's counsel and appellant's counsel consented that this should be done. In giving the instruction, the court referred to the evidence asserted by the Government to constitute proof that the appellant was the aggressor, but made no reference to the evidence which tended to prove the contrary. I set out in the margin the instruction in question.[2] It will be noted therefrom that the court said that under no circumstances could the defendant avail himself of the plea of self-defense if he was the

2 "You will recall, in that connection, that I stated to you that assault was violence inflicted without justification or excuse. Counsel has not argued the question of self-defense; nevertheless I will explain the law to you with respect to the rights or lack of rights of the defendant under whatever theory of the evidence you may take as to what happened at that particular point and at that particular time. The defendant is ·charged with the offense of an assault with intent to kill McCullough. By way of defense to this charge, the defendant suggests that he did what he did in self-defense. However, you are instructed that the plea of self-defense is not available to the defendant unless at the time of the altercation he honestly believed that, and had reasonable grounds for believing that he could save himself from death or serious bodily harm only by assaulting Lawrence McCullough. It was the duty of the defendant to exhaust all reasonable means in his power to save his own life and prevent himself from receiving serious bodily harm, and only after all reasonable means had failed was he justified in attacking Lawrence McCullough with intent to kill. Under no circumstances could the defendant now avail himself of the plea of self-defense if the defendant was the aggressor in the altercation. In that connection, the Government says that the defendant was the aggressor, that laying aside whatever else happened up to that time, that when he laid hands upon Joyce Smith upon her private part, then McCullough had the same right to protect Joyce Smith that he had to protect himself. Also that even aside from that, the evidence shows beyond a reasonable doubt that the various elements necessary to constitute self-defense did not exist in favor of the defendant, although I have explained to you the law upon those two points.

"The Court instructs the jury that if they believe from the evidence that the defendant Lindsey placed his hands upon the private part of the person of Joyce Smith and that Lawrence McCullough then upon reasonable grounds believed that the defendant was about to attempt to have sexual intercourse with Joyce Smith against her will, then he, McCullough, had a right to use all the force necessary to protect the person of Joyce Smith from such attempt upon her by the defendant.

"Further on this question of the law of self-defense, a man does have the right to defend himself from assault by another and under some circumstances can kill another in the exercise of that right, but there are several circumstances which must exist in order to justify a man in killing another. In the first place, the person who is here claiming the right of self-defense must not have been the aggressor, that is, he must not have started the fight either by committing an assault either upon Joyce Smith or upon Lawrence McCullough. In the next place, the person who is the victim in this case, McCullough, must have been about to assault the defendant, or the circumstances must have been such as to cause the defendant to believe that an assault was actually being made or about to be made upon him, and that must have been an assault without cause, without justification or excuse.

"Second, such assault, whether actual or apparent, must be such as to endanger the life of the defendant or threaten great bodily harm to him. Mere words are not enough; there must be such an assault which if carried out would inflict serious bodily harm or possibly death.

"Third, the defendant must believe that he is in danger of death or serious bodily harm. He must honestly believe that. And the facts must be such that a reasonable person under the same circumstances would also reach that belief.

"And also in such a case, the force which is used in repelling the· assault must not be excessive, and if the assault could be avoided by merely desisting from an attempt to commit rape upon Joyce· Smith, then the defendant would have no· right whatever to plead self-defense."

aggressor in the altercation, and that then the court went on to say that in that connection the Government asserted that the defendant was the aggressor and that, laying aside whatever else happened up to that time, when he laid hands upon Joyce Smith, then McCullough had the same right to protect her that he had to protect himself. This constituted a reference to the evidence of the Government against the appellant from which the jury might conclude that he was the aggressor. But the instruction omitted to outline or call to the attention of the jury the items of evidence in the record which, if believed by the jury, might prove that the appellant was not the aggressor. These items were the appellant's statement as testified to by his expert (Williams) that when the woman said "Is that you, Lester?" then the appellant "turned around and looked in her direction and made to go in her direction when the soldier hit him and he [the appellant] said I whipped him"; also the statement of the appellant as testified to by a police officer (Scott) "but if he [McCullough] had not jumped on me there, I would not have been in trouble there," and further, "and he jumped on me and there was a tussle" and "I didn't try to make them think I had a gun."

It is well settled law, which we have recognized in this jurisdiction in Meadows v. United States, 1936, 65 App.D.C. 275, 82 F.2d 881, that where a court in the course of instructions to the jury assumes to refer to evidence it must not do so in a manner which emphasizes one aspect of the evidence to the exclusion of another, but must fairly state all of the evidence on each side of any issue which is the subject of an instruction. In the Meadows case we held that an instruction which singled out and declared the effect of certain facts without consideration of other modifying facts constituted prejudicial error. The fact that an instruction on self-defense was not formally requested cannot cure the error. If an instruction is given it must be given correctly.

The crimes with which the appellant is charged in the instant case are of extremely grave character. If he committed them, his conviction should be as prompt as is consistent with fair trial, and the punishment prescribed by law should be swiftly and certainly imposed. But if he did not commit the offenses charged, or if he is insane, his conviction is as grave an injustice as would be his acquittal in the event of guilt. No verdict of guilt can properly be reached under our system of law without a trial in which the rights of the defendant which are guaranteed by the law are adequately protected. For the reasons set out above, I think that they were not protected in this case because of undue limitation of cross-examination upon a crucial issue and because the instructions were out of balance. I think that there should, therefore, be reversal and a new trial.

The particular errors in instructions which are above discussed were not called to the attention of the trial judge by objection on the part of the appellant's counsel below, but it is well settled that where life or liberty is involved an appellate court may notice and correct a serious error plainly prejudicial even though it was not called to the attention of the trial court, or even where the error was not preserved for review by proper objection, exception or assignment. Miller v. United States, 10 Cir., 1941, 120 F.2d 968; Kinard v. United States, 1938, 68 App.D.C. 250, 96 F.2d 522. The Government raises no objection to the application of this rule.

3. In respect of the constitutionality of D.C.Code (1940) § 22—2801: That statute provides, so far as here pertinent, "that in any case of rape the jury may add to their verdict, if it be guilty, the words 'with the death penalty,' in which case the punishment shall be death by electrocution. . . ." The appellant contends that this statute denies him the right of jury trial guaranteed by Clause 3 of Section 2 of Article III of the Constitution and by the Sixth Amendment. While the appellant's contention is put in terms of denial of the right of jury trial as jury trial was known to the common law at the time of the adoption of our Constitution, it is, in effect, an assertion that he has a constitutional right to be sentenced by a judge. It is not disputed that he had a jury trial in the sense of that term in the common law at the time of the adoption of the Constitution, in that the jury consisted of twelve men, that the trial was conducted before them in the presence and under the superintendence of a judge having power to instruct the jury as to the law and advise them in respect of the facts, and that the verdict was unanimous. Cf. Patton v. United States, 1930, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263. But the appellant urges that the power of fixing the punishment given the jury by the statute was improperly

conferred, since at the time of the adoption of the Constitution common law juries did not fix the penalty, that being left to the judge.

Examination of all of the authorities cited by both the appellant and the Government on this question, and of additional authorities discloses nothing conclusive. Green v. United States, 1913, 40 App.D.C. 426, 46 L.R.A.,N.S., 1117, relied upon by the Government, does not, as I read it, rule on the question. That case involved a statute identical with the one in the instant case in all particulars here material. To a charge of rape the defendant offered on arraignment to plead guilty. The plea was refused by the court, and the defendant was tried by a jury as on a plea of not guilty and the jury returned a verdict of guilty to which they had added "with the death penalty". The court accordingly sentenced the defendant to be executed. On appeal, "the only question presented for review"—as stated in the opinion—was that of the correctness of the refusal of the trial court to accept a plea of guilty. This court, in an opinion by Mr. Justice Van Orsdel, treating the question as one of statutory interpretation, held that the statute could not be construed to permit a plea of guilty; that in all possible cases (1) guilty without assessing the death penalty, (2) guilty with the assessment of the death penalty, and (3) guilty with division of opinion in the jury as to the imposition of the death penalty, the court must have the verdict of the jury upon which to base its judgment. It is true that in the course of the opinion the court remarked that "Statutes depriving a defendant of the right to plead guilty, where the alternative punishment of death or imprisonment is left to the discretion of the jury, are upheld upon the theory that he cannot be prejudiced, in that the constitutional safeguard of a trial by jury is accorded him." But examination of the briefs and record in the case shows that no question as to the constitutionality of the statute—because it gave the jury, rather than the judge, the choice of penalty—was raised or argued. In Winston v. United States, 1899, 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456, an act of January 15, 1897, c. 29, 29 Stat. 487, 18 U.S.C.A. § 567, provided that in all cases in which the accused is found guilty of the crime of murder under Rev.Stat. § 5339 (1878)[3] "the jury may qualify their verdict by adding thereto 'without capital punishment;' and whenever the jury shall return a verdict qualified as aforesaid the person convicted shall be sentenced to imprisonment at hard labor for life." At the trial the jury was instructed that this statute meant that the jury might qualify their verdict in cases where there were some mitigating or palliating circumstances. The Supreme Court held that the instruction was erroneous, that the statute could not properly be interpreted to limit in any manner the discretion of the jury to qualify their verdict. No constitutional question was presented or discussed, only this point of interpretation.

It is said that at the early common law, indeed as late as 1725, the jury did fix the punishment. See Spooner, Trial by Jury (1852) pp. 91 et seq. At the time of the adoption of the Constitution this seems not to have been the case. 1 Bishop on Criminal Law (9th Ed. 1923) § 934. But in view of the facts that the three elements of trial by jury defined in Patton v. United States, supra, were accorded the appellant, that the judicial power is vested under Section 1 of Article III in such inferior courts as the Congress may establish, and that the jury is a part of the court, and that there is no prohibition in the Constitution against choice of punishment by the jury or requiring sentence to be imposed by a judge, and in view of the fact that a statute is not to be held unconstitutional unless clearly so, I am strongly inclined to the view that the statute is valid and that the appellant was, therefore, deprived of no right by the jury's addition of the death penalty to their verdict and the consequent imposition of the same by the sentence of the judge.

But the question of the constitutionality of this statute is one of public importance. The statute is frequently invoked. It involves the life of the appellant. In view of the paucity of authority on the question and of the fact that this court cannot rule with complete finality, I think that it should, under Section 239 of the Judicial Code, 28 U.S.C.A. § 346, certify the question of the constitutionality of the statute to

[3] Section 5339 provided that "Every person who commits murder...Within any fort, arsenal, dock-yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States...shall suffer death."

the Supreme Court of the United States for instructions.

Reversed and remanded.

RUTLEDGE, Associate Justice (concurring).

I concur with Judge Stephens that the judgment should be reversed and a new trial had. My reasons are somewhat different from his.

Issues of identification, use of force and lack of consent in the rape, and self-defense in the assault upon the woman's male companion were proven clearly against appellant. There was sufficient evidence to sustain the finding, implicit in the verdict, that the assault was with intent to kill. In my opinion the instructions were not reversibly erroneous in any respect, and the contention is not valid that the statute is unconstitutional which empowers the jury to add the words "with the death penalty" to the verdict in cases of rape. D.C.Code (1940) § 22—2801.

However, I am in accord with Judge Stephens' view that cross-examination by the defense was unduly limited in one vital respect. This was when the court refused to permit it to question Drs. Lind and Schneider, expert witnesses for the Government, concerning the grounds for their conclusion that defendant was lying or malingering at the time when they, with Dr. Williams, defense expert, applied the mental test known as the Kent test. The circumstances of this limitation have been set forth fully in Judge Stephens' opinion. In my judgment it was highly prejudicial in the state of the evidence prevailing when it was made.

The crucial issue was appellant's sanity. As presented by the evidence it was, not whether he is a person of high or even of average intelligence, but whether he falls on one side or the other of the line which divides imbecility, a mental age of from three to seven years, from the mental level immediately above it. Upon this, expert opinion was squarely and evenly divided. There was little conflict in the facts from which the opposing conclusions were drawn. Clinical evidence, including historical information, combined with the results of four mental tests to support the conclusion of the defense experts that appellant is an imbecile and insane. The opposite conclusion of the experts for the Government, though supported by clinical evidence, was contradicted by the results of all the mental tests, including the Kent test, which was the only one they applied.

They discarded the results of this test. Their reason was belief that appellant was lying or malingering. They based this on the fact he was not cooperative when the test was given, evidenced by noncommittal answers to simple questions and answers inconsistent with others given at previous interviews. Dr. Schneider coupled these reasons with the fact appellant "had one of the strongest reasons in the world to profit by a diagnosis of insanity." Dr. Williams, who also was present when the Kent test was applied, disagreed that appellant was lying, attributing his noncooperation to depression.

In this state of the evidence it became crucial for the defense to test the validity of the Government experts' conclusion that defendant was lying. Without that their ultimate opinion that he was not an imbecile and was sane could not have stood or, standing, would have been seriously impeached. We cannot speculate what their judgment might have been, absent this belief, or what might have been the effect on the jury if the basis for it had been destroyed or seriously impaired.

The defense attempted to test the validity of the grounds for this belief by cross-examination in the manner set forth in Judge Stephens' opinion. This was by showing that similarly inconsistent statements had been made, in response to similarly simple questions, when appellant had no reason to profit by a diagnosis of insanity, in fact when he would profit by one of sanity. The excluded questions were limited to a single instance, namely, that appellant had given his birthplace once as North Carolina, another time as New Jersey, while he was under treatment at the Crownsville hospital about five months before his offense was committed. However, the record is replete with evidence of similarly inconsistent statements about the simplest matters, made by appellant both at Crownsville and elsewhere and both before and after the offense. Shutting the door upon the first inquiry closed it upon all.

The court apparently thought the witnesses' "credibility" could not be tested in this manner. The questions went, not to test their veracity, but to test the soundness of the foundation or one of the reasons assigned by them for believing appellant was lying, and thus for discarding the results of the test which showed him an imbecile.

378

They offered, if not the only, then one obvious method of destroying or impairing the assigned basis for that conclusion. It may be that the witnesses would have vindicated their conclusion, if full inquiry had been allowed. But it was cut off with effects, upon a matter so vital, which can only be guessed, not known.

Taking account of the state of the evidence, the even balance of expert opinion, the absence of impeachment of any of the witnesses for veracity or expertness, the equality of opportunity for examination and investigation, the consistency of scientific and clinical evidence in support of the defense alienists, the conflict between the conclusions of the experts for the Government and the results of all the mental tests including their own, the importance in this setting of their conclusion appellant was lying and of their reasons for it, and the conflict in expert opinion whether this was true, I am unable to conclude that the limitation was not erroneous or was without substantial prejudice to the defense.

I think also that it was error to admit the opinion of Dr. Gross that appellant was not an imbecile and was sane, and to rule, as the court did, that Dr. Ogden, tendered as an expert witness by the defense, was not qualified to testify as an expert in mental matters. The latter had signed appellant's commitment certificate at Crownsville. Called by the defense, he testified to his general medical qualifications and experience, stated he had "interned in psychiatrical work," and since that time had been "doing a good bit of committing work for the insane for the Department of Public Welfare." After he had stated he had done no more than this as a mental specialist, the court ruled, when the Government objected, that he was not qualified as an expert. Although his qualifications may not have been the highest, it would seem that, upon the training and experience stated, his opinion should have been admitted for whatever it may have been worth.

In contrast with exclusion of Dr. Ogden's opinion was reception of that of Dr. Gross. He was called by the defense merely to produce and identify the Crownsville records. Upon cross-examination, the Government elicited from him testimony concerning the effects of marijuana, the alleged cause of appellant's commitment at Crownsville, and the opinion that appellant is not an imbecile and is sane. On redirect examination the defense demonstrated conclusively that the witness was not qualified to give expert opinion concerning marijuana and its effects. It showed also, over difficulty created by the prosecution's objections, that the witness' only examination of appellant was during a brief staff conference just before he was paroled. The official minute of the conference shows that hardly more than half a dozen questions were asked. In view of his position, Dr. Gross was qualified initially, perhaps, as a mental expert. But in view of the cursory nature of his "examination," as disclosed by his own testimony, no sufficient foundation was laid for permitting him to express the opinion that appellant is not an imbecile and is sane. Yet it was allowed to remain in the record as evidence against the defendant, and possibly with prejudicial effect.

Whether or not these errors, standing alone, would be sufficient to require reversal, they are so, in my opinion, when coupled with the limitation of cross-examination of Drs. Lind and Schneider, discussed above. When account is taken of the entire state of the evidence upon the issue of sanity, it cannot be assumed that the combined effect of these errors was not prejudicial or did not turn the scales against the appellant upon that issue.

Accordingly, I think the judgment should be reversed, and the cause remanded to the District Court for another trial.

EDGERTON, Associate Justice (dissenting).

"The extent of cross-examination rests in the sound discretion of the trial judge."[1] A judge uses unsound discretion if he excludes proper questions which might break the force of important testimony. The cases of Alford v. United States[2] and District of Columbia v. Clawans[3] were of that sort. This case is not. The government psychiatrists, Drs. Lind and Schneider, were cross-examined at length. The cross-examination of each occupies more than a dozen printed pages of the record. Both witnesses had twice given general mental examinations to the appellant. On the second occasion, the Kent test was a part of

[1] District of Columbia v. Clawans, 300 U.S. 617, 632, 57 S.Ct. 660, 665, 81 L.Ed. 843. Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680.

[2] 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624.

[3] 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843.

the examination. Both witnesses were asked, and allowed to answer, why they concluded that appellant was "uncooperative" or "malingering" on the second occasion and that his Kent score did not reflect his real ability. Neither witness limited his explanation of this matter to the fact of appellant's self-contradictions, i. e., opposite answers to identical questions. On the contrary, both witnesses emphasized the fact that, on the first examination, appellant had answered questions intelligently. This was conclusive, they pointed out, both on the crucial question of appellant's sanity and on the question whether he was shamming when, on the second examination, he talked like an imbecile. Both witnesses emphasized the fact that on the second examination appellant appeared to be sulky, and frequently said "I don't know," and the like, in response to simple questions which, as the witnesses knew from his first examination, he could answer if he chose.

Yet it is said that appellant's counsel should have been allowed to elicit the views of these two witnesses with regard to the bearing, if any, upon the question whether appellant was malingering on his second examination, of his alleged self-contradictions in the Crownsville hospital when he had no apparent motive for shamming. In my opinion the court might, in its sound discretion, have excluded all inquiry into the views of the witnesses on this subject. However, the court did not do so. Dr. Lind was cross-examined on the point before objection was made, and testified that appellant's having made contradictory statements in the Crownsville hospital would "not in and of itself" indicate anything "at all" to him. The question put to Dr. Schneider was poorly phrased and ambiguous, and was apparently excluded on that account.[4] The court did not intimate that it would exclude a question definitely directed to the bearing, if any, of the Crownsville self-contradictions either upon the ultimate issue of appellant's sanity or upon the question whether he was maling-

ering on his second examination. Counsel made no attempt to pursue the inquiry. There is no reason to believe that pursuit of it would have reduced the effect, in the minds of the jury, of the positive and reasoned testimony of Dr. Lind and Dr. Schneider that appellant was sane.

The other instances in which the court limited cross-examination seem to me equally proper and equally unimportant.

Dr. Gross was not disqualified as an expert in mental disease by his frank statement that his experience with marijuana was limited. He did not even disclaim all knowledge of marijuana. He said, "I read about it; my personal experiences are very small." He answered some questions, and said that he could not answer others, on that subject. His conscientious disclaimer, and his refusal to guess, where he lacked knowledge, increase rather than diminish the value of his positive testimony that appellant was sane.

Whether the court ruled that Dr. Ogden was not qualified to testify as an expert in mental disease is not entirely clear; but nothing in the record suggests that such a ruling, if made, kept out any testimony which appellant wished to introduce. The District Attorney said, "I do not think the doctor is qualified." The court replied, "I do not think we have enough—you can ask what he did in connection with the commitment of this man." This was apparently satisfactory to appellant's counsel, for he said "I see" and proceeded to draw from Dr. Ogden a full account of the episode which culminated in the doctor's committing appellant to the Crownsville mental hospital. The doctor testified: "I felt that he was commitable to an insane hospital and I wrote the commitment certificate." No question which counsel asked the doctor was excluded, and no proffer or suggestion indicates that counsel was deterred from asking any question which he wished to ask.

No evidence of self-defense was introduced, except certain extra-judicial self-

---

4 Counsel: "Very well, then, Doctor. On February 16, if he is in an institution for the insane and he is trying to get out, and on February 16th he makes this statement, that he was born in Winston-Salem March 29, 1922—that is on February 16th. On the next day, he comes up before a staff conference * * *, and he says that he was born in the State of New Jersey. On that one statement alone, Doctor, would you say that the man was lying and malingering? * * *"

The Court: " * * * I don't think that he can answer your question from that one thing, that the man made two different statements as to the date of his birth—whether that is malingering. I do not think it sheds any light on the doctor's credibility, and I sustain the objection."

serving statements of appellant which were reported by various witnesses. Counsel did not argue self-defense to the jury, or ask an instruction on the subject. Both sides declared themselves satisfied with the court's charge. The only defense offered to the jury was insanity. Nevertheless, it is now urged that the judge's charge was not sufficiently favorable to appellant with regard to self-defense and the related subject of specific intent to kill. Counsel and court proceeded, throughout the trial, on the assumption that there was no substantial evidence favorable to, appellant on those subjects. I see no basis for saying that counsel and court were wrong.

Appellant contends that the rape statute, by authorizing the jury to choose between a life sentence and a death sentence, deprives appellant of trial by jury. This is nearly a contradiction in terms. The authorities are the other way. Death sentences under this same statute have been affirmed by this court, in Green v. United States[5] and in the recent case of Robinson v. United States;[6] and a jury's authority, under a similar statute, to choose between a life sentence and a death sentence was upheld by the Supreme Court in Winston v. United States.[7] In the Robinson case, a motion for stay of execution raised the contention that the statute was unconstitutional. On October 9, 1942, we rejected the contention, declined to certify the question to the Supreme Court, and refused the stay. The question is not open here.

We have studied the record with the anxious care which is inevitable in a capital case. In my opinion there were no errors of the slightest consequence, and the judgment should be affirmed. It is neither correct nor useful to attach "the monstrous penalty of a new trial"[8] to supposed technical errors, if any, which are not prejudicial.

---

[5] 40 App.D.C. 426, 46 L.R.A.,N.S., 1117.

[6] 76 U.S.App.D.C. 29, 128 F.2d 322.

[7] 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456. All the elements of trial by jury, which the Supreme Court enumerated in Patton v. United States, 281 U.S. 276, 288, 50 S.Ct. 253, 74 L.Ed. 854, 70 A. L.R. 263, were present in the instant case.

[8] 1 Wigmore, Evidence, 3d Ed.1940, § 21.